[No. F017223. Fifth Dist. June 8, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT ALAN TAPIA, Defendant and Appellant.

COUNSEL

Kyle Gee, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, J. Robert Jibson and Karen L. Ziskind, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

FRANSON, J.*—

### STATEMENT OF THE CASE

Following jury trial, appellant Robert Alan Tapia was convicted of first degree murder. (Pen. Code, § 187, subd. (a).)[1] The jury found true the special circumstance allegations that he committed the murder during the commission of a robbery and during the commission of a burglary and that he personally used a dangerous and deadly weapon. (§§ 211, 190.2, subd. (a)(17), 12022, subd. (b).) The jury also found appellant guilty of robbery, and found true the special allegation that he personally used a dangerous and deadly weapon in the commission of this crime, as well as convicting him of two counts of assault with force likely to cause great bodily injury, arson, and of the unlawful driving or taking of a vehicle. (§§ 211, 12022, subd. (b), 245, subd. (a)(1), 451, subd. (b); Veh. Code, § 10851, subd. (a).) The jury fixed the penalty for the murder (count 1) at life imprisonment without possibility of parole.

Appellant was sentenced to life imprisonment without the possibility of parole on the murder to run consecutive to the determinate terms imposed on the remaining counts. On the remaining counts, appellant was sentenced to the additional terms of seven years imprisonment for the robbery (count 2), four years for each of the assaults (counts 3 & 4), eight years for the arson (count 5) and eight months for the vehicle theft (count 6). The term on count 6 was ordered to run consecutive to that imposed on count 5 and the terms on counts 2, 3 and 4 were ordered stayed.

*Retired Presiding Justice of the Court of Appeal, Fifth District, sitting under assignment by the Chairperson of the Judicial Council.

[1] All statutory references are to the Penal Code unless otherwise noted.

Appellant raises four allegations of error. First, he contends the trial court improperly denied his "*Wheeler*"[2] motion. Next, he argues the court erred in admitting evidence of a plan to violently rob a man named "Tom." Finally, he avers the court erred in rejecting two defense instructions, the first of which addresses "proximate causation" in relation to felony murder while the latter asserts that "robbery was not proven unless the jury found that an intent to steal was the motive for the application of force."

We find merit in appellant's *Wheeler* argument and reverse the judgment with directions to conduct a new *Wheeler* hearing pursuant to the procedure outlined in *People* v. *Gore* (1993) 18 Cal.App.4th 692, 707 [22 Cal.Rptr.2d 435]. Appellant's other contentions are rejected.

STATEMENT OF FACTS

*Introduction*

It is undisputed that during the early morning hours of February 12, 1989, appellant killed Clyde Mayer by repeatedly striking him about the head with a firebrick and a log and that he stole Clyde's car and set his house on fire. It is also undisputed that he spent the money in Clyde's wallet and made purchases with Clyde's Mastercard. However, appellant claimed that he did not kill Clyde to facilitate the theft of Clyde's car and wallet. Rather, appellant told authorities he killed Clyde because he was angry with Clyde because he had sexually assaulted appellant earlier that morning.

A. *The Prosecution*

i. *The victim, Clyde Mayer*

Clyde Mayer was a 61-year-old semiretired pharmacist. Clyde lived in Three Rivers on a five-acre ranch with his wife, Jean, their adult daughter, Danielle Mayer, and Danielle's eighteen-month-old son, Austin. Clyde was five feet eight inches tall, within normal weight range and of normal muscle mass for a man his age. He was described by witnesses as "scrawny," "thin" or "slender." When not on his person, Clyde stored his wallet, pocket knife and keys in the top drawer of his dresser in the Mayers' bedroom.[3] He customarily slept in the nude.

The Mayers traveled extensively both inside and outside the United States. Clyde especially loved to go to Las Vegas. During their travels, he would

---

[2]*People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (hereafter *Wheeler*).

[3]During cross-examination Danielle testified that while her father did not normally leave his wallet in his car, when he was skiing he would do so. She also testified that her father was planning on going skiing the weekend he was murdered.

often befriend young men, helping them to find jobs, giving them and their families money and clothes and sometimes even trying to secure legal residency for them in the United States. It was not uncommon for Clyde to travel alone or with a young man.

For over 30 years, Clyde picked up hitchhikers and occasionally brought them home. Sometimes, Clyde would pay them for performing maintenance jobs around the ranch. Clyde loved to drive and would drive long distances to help people.

### ii. Clyde's relationship with the Tapia family

In relevant part, the Tapia family consists of appellant, his brothers, Michael and Mark, and their sister, Donna Yancy. During the summer of 1988, Michael was hitchhiking in Visalia and was picked up by Clyde. During the ride, Clyde asked Michael if he would like to go to Las Vegas with him. Michael agreed and shortly thereafter they went to Las Vegas together. Clyde paid for their food, lodging and entertainment. Through his relationship with Michael, Clyde met Mark. Clyde took Mark on a trip with Michael to his cabin about a week after he took Michael to Las Vegas. Michael was subsequently imprisoned and had no further contact with Clyde.

During the fall of 1988 Mark went to Clyde's house occasionally to help with projects around the ranch. Mark would eat with the Mayer family and sleep on their couch. Clyde bought Mark shoes and clothes. Clyde took Mark to Las Vegas on two occasions, paying for their food, lodging and entertainment and to Sacramento and the Fresno County Fair. By February of 1989, Mark had begun to "bother" Clyde, often calling collect and asking for "lots of favors."

Appellant was introduced to Clyde through his brothers. Prior to February 11, 1989, Clyde had taken appellant to a shopping mall and bought him a black shirt and had taken him out for a malt. Mark told appellant that Clyde had money.

### iii. Appellant's activities prior to the homicide

In July of 1988, appellant met 16-year-old Melissa Wright. Melissa lives in Colorado but came to Lemoore, California, that summer to visit her friend, Annette Pena. Annette knew appellant and introduced him to Melissa during a three-way telephone call between appellant, Annette and Melissa. Appellant and Melissa became friends and shortly after Melissa returned to

Colorado appellant began to telephone her and Bridgette Merrill, a friend of Melissa's, quite frequently. During these calls appellant spoke about going to Colorado and mentioned the possibility of moving there.

In January of 1989, appellant began talking more and more about going to Colorado to see Melissa and Bridgette. Although he was unemployed, he told them he would buy them clothes and jewelry. Appellant told Melissa he had an uncle who owned a car lot and would give him money and a car. He told them both he had money from work as a male model. During the early part of February 1989, appellant began calling the girls on a daily basis, sometimes even hourly. He frequently told them he was coming to Colorado with a car to buy them things.

Appellant had also been telephoning 14-year-old Cindy Graham during this period. During the week preceding the homicide he called her on Wednesday, Thursday and Friday. He told her he would come to visit her on Saturday in his uncle's car, that he had credit cards and would buy her $2,500 worth of merchandise, including Reebok brand athletic shoes for her 11-year-old cousin, Jason.

Appellant met Michael Henry (hereafter Henry) in late 1988. During the early part of February 1989, approximately one and a half weeks before Clyde's death, appellant ran into Henry at a Quickstop in Lemoore. Appellant told him he had met a man named Clyde Mayer who had a lot of money and credit cards and that his brother Mark was visiting him frequently. Appellant told Henry he and Mark were going to drown Clyde in the bathtub so appellant could take his money and credit cards and use his bank teller card. Appellant told Henry he knew the code necessary to access Clyde's account.

Three or four days prior to the homicide, appellant spoke with Roger Darnell,[4] who was living with the Tapia family at the time, about robbing a man named Tom because he wanted Tom's car to go to Colorado and see some girls. Appellant wanted Roger to talk to Tom while he crept up behind him and hit him on the head with a pipe. Appellant planned for them to tie up Tom, put him in the trunk of the car and then he and Roger would drive to Colorado. Appellant had a rusted pipe from a bicycle seat in his pants at the time he suggested the robbery to Roger. Roger told appellant he did not want to go through with this plan so appellant dropped the idea.

iv. *The homicide*

On February 10, 1989, appellant told Suzanne Garcia that he was going to stay at a friend's house in Three Rivers for the weekend. Also on that same

---

[4]Roger testified under grant of immunity.

day, Roger participated in a three-way telephone conversation between himself, Melissa and appellant during which he heard appellant tell Melissa "he was getting some money and a car, that he'd come up [to Colorado] to see her."

Later that day, appellant made a collect telephone call to Clyde and asked if he could come to his house to use his typewriter. Clyde agreed.

At approximately 7 p.m. on Saturday, February 11, 1989, Clyde drove to appellant's home to pick him up. When he arrived, appellant introduced Clyde to Roger and asked if Roger could come with them. Clyde told appellant he did not know Roger well enough so just appellant and Clyde drove back to Three Rivers. At the time appellant left with Clyde, he was wearing black Levi pants, an old pair of Reebok brand athletic shoes, a "button-up shirt" and a "tannish sweater."

Prior to leaving with Clyde, appellant told Roger that he was going to "take the old man's money." Specifically, appellant told Roger he was going to "roll" Clyde. Appellant also told Roger he expected Clyde would be alone in the house because his wife traveled. He also told him he thought Clyde was "gay or something."

After appellant and Clyde left, Mark told Roger that appellant was going "up to the house to take the old man's car and his money" and that appellant "was gonna kill the old man"[5] and "set the house on fire."

At approximately 8:30 p.m. that same evening, Danielle and Austin returned home. Danielle put Austin to bed and saw that Clyde and appellant were in the kitchen. A typewriter had been placed on the kitchen table. Throughout the evening appellant typed intermittently, stopping often to warm his hands in front of the wood-burning stove located in the living room or to talk to Clyde or Danielle. Danielle braided leather for horse tack and Clyde watched television, did the dishes and helped Robert with his typing. Clyde and appellant decided appellant would spend the night at the Mayers' house and Clyde got out a sleeping bag and put it on the living room couch for appellant. Danielle went to bed at midnight, leaving the door to her room slightly ajar.

At approximately 1:45 a.m. Danielle woke up. She saw that the television was still on, but the sound was turned down and she did not hear any voices,

---

[5]Roger's testimony about whether Mark told him appellant planned to kill Clyde was inconsistent. At one point Roger unequivocally testified that Mark told him appellant was definitely planning to kill Clyde. However, at two other points during his testimony he stated Mark told him appellant planned to "commit bodily harm" if Clyde "tried anything."

so she went back to sleep. Sometime prior to 4 a.m., Danielle was again awakened by her son calling out to her. She quieted him down and then listened for a few minutes to see what had disturbed him. Hearing nothing, she fell back to sleep. At 4 a.m. Danielle was again awakened, this time by the sound of the smoke alarm located in the kitchen, just outside her bedroom.

Danielle got up and attempted to pull the battery out of the smoke alarm. She noticed the living room was filled with smoke. She ran into the room, but did not see appellant in his sleeping bag. While in the living room she noticed flames in her parents' bedroom and saw her father lying facedown on the floor, naked. He was bloody from the neck up, his arms were straight to his side, and his legs were also straight. The entire foot of the bed closest to her father was on fire. She called to him and he made "gurgling sounds. And every ten seconds or so he would like heave in his breath." Danielle called 911 and got her son out of the house, yelling for help. With the assistance of a neighbor, Danielle dragged her father outside onto the grass. Firefighters arrived and after examining Clyde and determining he had no pulse, they attempted to contain the fire. However, it was a fast-moving fire and the house burned to the ground.

The pathologist who performed the autopsy concluded that Clyde died from extensive intracranial hemorrhage due to multiple skull fractures. Any one of eight major cranial wounds could have caused his death. The most significant wound resulted from a blow which fractured the back of Clyde's skull. No defensive wounds were observed. Clyde also suffered thermal injuries on his legs, back and neck. Clyde could have survived for five to ten minutes after receiving the head wounds but would have lost consciousness after a few minutes or less. In any event, after receiving multiple blows, Clyde would have been unable to stand up because "the severity of trauma to the brain substance, itself, and the head would have precluded any kind of voluntary activity." Although no log fragments were found in his skull, the pathologist concluded that Clyde's wounds could have been caused by a brick or log. The lack of soot in the tracheal-bronchial area indicated that Clyde was either dead or breathing shallowly and close to death at the time of the fire.

Oral, rectal and penile swabs were taken. The penile swab was positive for semen. The semen could not have come from appellant but could have come from Clyde.

v. *Appellant's activities after the homicide*

At approximately 4:30 or 5 a.m., appellant arrived back at his house and awakened Mark and Roger, telling Roger they were going to Fresno. Roger

noticed that although appellant appeared calm, he had blood on his hands and sweater. Roger asked appellant what happened and appellant told him that he had been in a fight. After appellant and Roger packed some clothes in two duffel bags, the three left Lemoore in Clyde's Ford Escort. While they were packing, appellant told Roger "that he had gotten the old man's money." He also told Roger the car belonged to "a friend."

Before they left, appellant told Mark he had killed Clyde because he wanted his car to go to Colorado. He said that he had hit Clyde in the head and started the fire by placing toilet paper around the bed. He also told Mark he had stolen Clyde's wallet, showing Mark the money and credit cards, and telling Mark that he intended to spend the money. Appellant never indicated to Mark that he had been sexually assaulted.

During the drive to Fresno, Roger saw appellant count over $300 in currency which he kept "up under [his] left leg." Roger saw Clyde's wallet up by the car's gearshift. Appellant told Roger he had taken the wallet from Clyde after striking him "a couple times with his fist."

After stopping to buy gas, cigarettes and sodas, the threesome drove to Sam Phelps's house and gave him a pair of skis and ski boots which were in Clyde's car. They also disposed of some ski poles and threw away some papers from the backseat of the car. Next, they went to Oscar and Evelyn Pavlich's house and visited for "about an hour maybe," before driving to Chowchilla to see Cindy Graham. Appellant and Roger told Oscar they were on their way to Colorado.

The threesome arrived at Cindy's house at approximately 8 a.m. When Cindy went outside to greet appellant, he was sitting in Clyde's car counting $200 in currency. Cindy joined the group.

Appellant treated them all to breakfast at a truck stop, after which they picked up Jason and then appellant took them shopping. They went to Sprouse Reitz and then to J.C. Penney's but left after appellant was told he would not be allowed to charge anything. Next, they went to Shoe Shack where appellant bought Reebok brand athletic shoes and tee shirts for everyone in the group, using Clyde's Mastercard. Appellant told the clerk, Carmen Carrillo, the credit card belonged to his uncle and that he had permission to use it. However, Carmen felt uncomfortable about the transaction and wrote down the license plate number of the car they were driving. Before leaving the store, appellant told Carmen that he was going to a family reunion in Colorado.

The group next went to a swap meet where appellant bought two pairs of gloves, and then to a retail store named Fashion Lane where appellant

bought Cindy a number of items, including a wallet, sunglasses, earrings, a bracelet and a purse. Cindy appeared hesitant about making the purchases, but appellant assured her it was okay, and paid for the items with Clyde's Mastercard. He signed the receipts using the name Robert Garcia, telling the clerk, Sherisse McCullough, that the card belonged to his uncle and he had permission to use it. One of the young men told Sherisse he was going to Denver.

The group returned to Cindy's house. Mark left to buy beer. After he drank the beer, they all left and went shopping again, with appellant driving the car and paying the bills.

Cindy testified that Mark was acting quiet and scared but appellant seemed to be enjoying their activities and did not look like anything was bothering him. At one point appellant said to Cindy that he had blood on his pants and that she must think he was dirty.

Roger testified that while all five of them were in the car appellant told them the car "belonged to Clyde; that he had killed him and set the house on fire." Appellant said he hit Clyde first with his fists to knock him down, and then with a brick. "The old man started to like grunt and move, so he hit— picked up a fire log and hit him again till he stopped moving." About 10 seconds later appellant turned around and told them he was kidding.[6]

The group returned to Cindy's house in the late afternoon, and appellant left before dark with Mark and Roger. At some point during the day appellant and Roger told Cindy and Jason that they were going to Colorado for a reunion. The next time Cindy spoke to appellant was when he called her from the Visalia County jail. He told her that he was in jail for "murder in self-defense."

After leaving Cindy's house, the three men drove to Fresno to visit Donna Yancy. After arriving, Roger went to the car to get something and found Clyde's name on the car registration in the glove box. He confronted appellant who confessed to him, saying "it was true, that he had—he don't know if he'd knocked him out or killed him or what, but that just to be safe and sure, he'd drugged the old man towards the bed, put toilet paper on the bed and set the house on fire." Appellant told Roger he hoped Danielle would die in the fire "so there wouldn't be no witnesses." Appellant said he killed Clyde for the money and because he did not like Clyde because Clyde was gay. He also told Roger he had "seriously thought" about the crimes

---

[6]Cindy testified appellant did not say anything about fighting or killing anyone in her presence.

"for a while." He did not tell Roger he had been sexually assaulted or indicate that Clyde had attacked him.

Appellant and Roger spent the night in Fresno with the Pavlichs. However, because he was afraid of violating his parole, Mark returned to Lemoore.

Appellant and Roger were arrested the next morning at Donna Yancy's house. When the officers arrived at the apartment, they saw Clyde's vehicle parked just outside the building. Inside the apartment the officers found Clyde's black credit card holder containing several credit cards lying on the kitchen counter approximately six feet from where appellant was standing. A Discover card, a Coast Savings card, and an American Pharmaceutical Association Mastercard in the name of Clyde Mayer were inside the holder. Roger was holding a key ring containing the keys to Clyde's Ford Escort.

Both Roger and appellant were wearing new Reebok brand athletic shoes and another pair of new Reebok brand shoes was found in the living room. The officers seized the shoes and appellant's wallet which contained $4 in currency and the names and phone numbers of a number of people, including Melissa and Bridgette.

When arrested, appellant was wearing bloodstained black Levi pants. The bloodstains were consistent with both Clyde's and appellant's blood groupings and were smear stains caused either by direct contact with an individual who was bleeding or by someone wiping a bloody hand on the pants. Officers searched Clyde's vehicle and found a long-sleeved sweater with bloodstains on it. The stains on the sweater were determined to have come from Clyde and were both smear and spatter stains, the spatter stains caused by blood being cast off and onto the sweater as a result of a stabbing or application of blunt force to an individual. Appellant's shirt and a handkerchief were also seized. The shirt had blood spatters on the bottom which could only have come from Clyde. Clyde's blood was also found smeared on the handkerchief.

After being taken into custody, appellant was photographed. He did not appear to have any bruises, abrasions or lacerations on his body indicating he had been in a fight or had been dragged across a hard surface.

### vi. *Appellant's custodial statements*

Appellant was first interrogated on February 13, 1989. In a taped interview with Detective Morales (hereafter Morales) appellant admitted he knew

Clyde and that Clyde had picked him up and taken him back to Clyde's house on Saturday night so he could use Clyde's typewriter. He stated that before he went to Clyde's house his brothers told him Clyde was gay. In this statement, appellant said that while he was at the house Clyde made a homosexual gesture towards him so he asked Clyde to take him back to Lemoore. Clyde drove him back, stopping at a mall in Visalia where Clyde again made a homosexual gesture towards him. Appellant managed to get away from Clyde, who subsequently left the mall. However, appellant stayed at the mall where he either formulated a plan to steal Clyde's car or he decided to continue with a preexisting plan to do so. Appellant hitchhiked back to Three Rivers. He told Morales he had a set of Clyde's keys from his first visit and when he got to the house he just got into the car and drove off. He told Morales he had some female friends in Colorado and he needed a car to visit them. He also told Morales the typewriter was just a pretense to get to Clyde's house and that he intended to steal the car and some money. However, appellant denied killing Clyde.

After being confronted with "certain details," appellant changed his story. Now he said that he had gone to Clyde's house to steal Clyde's car but that he was surprised when Danielle arrived home as he thought he and Clyde would be alone in the house. Appellant said that after Danielle went to bed, Clyde took a shower and then attacked him. He said he was in the "living room and he was grabbed by Mr. Mayer. And he was pulled or dragged from there towards [Clyde's] bedroom." Appellant told Morales that while he was being dragged into the bedroom he grabbed a brick which was near a fireplace or stove in the living room and he struck Clyde in the head with the brick. Clyde let him go but appellant struck him several more times. He then set fire to the house by igniting toilet paper he had placed on the bed because he did not want to leave any evidence behind, and fled the scene in Clyde's car. In this version, he did not actually have sexual relations with Clyde.

On February 14, 1989, officers discovered the tape of the February 13, 1989, interview was defective and so appellant was reinterviewed by Morales and Sergeant Jones. In this interview, appellant directly admitted that when he went to Clyde's house he planned to hit Clyde in the head, knock him out, and take his car and money. Appellant said that Roger and Mark had formulated this plan and "they had urged him to go up there and kill" Clyde. Appellant maintained he did not intend to kill Clyde at the time he went up to Three Rivers. Appellant also told the officers he "had thought about stopping his plan to steal the car because the daughter had showed up. And later on decided to go ahead and go through with it."

Appellant told Morales that after Danielle went to bed, Clyde took a shower. After Clyde got out of the shower, he said to appellant, " 'I want to

fuck you'" and called him into the bedroom. Clyde then dragged appellant from the living room into the bedroom. Appellant was crying and protesting. Holding a small pocket knife, Clyde "made [appellant] suck his groin and then he fucked him." When asked to describe the sexual act, appellant said his back was on the bed and, holding a knife to appellant's throat, Clyde forced appellant to get an erection with his mouth and his hands. Still holding the knife to appellant's throat, Clyde got on top of appellant and forced appellant to insert his penis into Clyde's anus. Appellant said he did not ejaculate. Initially, appellant said that when he was attacked he was only wearing a sweater, socks and swimming trunks which were pulled down around his knees as he was dragged into the bedroom.

Appellant said that after completion of the sex act he struck Clyde with a brick five times. Appellant left the room and started to get dressed. He was so angry over his forced participation in the sexual act that he wanted to kill Clyde. He got a log from the wood pile and went back into the bedroom and hit Clyde with the log, intending to kill him. Despite having been hit in the head with a brick five times, appellant said that when he went back into the bedroom to hit Clyde with the log, Clyde was standing up. He took Clyde's car keys and knife from the dresser, put on his jacket and drove off in Clyde's car. After the officers asked about the fire he said he went into Clyde's bathroom, got some toilet paper and put it on the bed. Intending to burn the house down, he set the paper on fire with his cigarette lighter. When asked whether he knew Danielle and Austin were in the house when he set the fire, he said he knew they were there and he was hoping they would die in the fire but that he thought they would smell the smoke and wake up. Appellant said he drove back to Lemoore, intending to reach Colorado before he was apprehended by the police.

Appellant admitted giving Clyde's skis to Sam Phelps and throwing away his ski poles. He also admitted spending all of the money he found in Clyde's wallet and making purchases using Clyde's Mastercard.

Appellant admitted telling Roger and Mark that he had killed Clyde "for the money and for the car." He said he "couldn't bring himself" to tell them about the sexual assault. Appellant consistently maintained that he decided to kill Clyde only after Clyde assaulted him. Appellant also told the officers that Clyde had never made any sexual advances toward him during their earlier excursions together and said that Clyde "'always seemed like a pretty nice guy.'"

vii. *Appellant's activities while awaiting trial*

While in jail, appellant communicated with a number of young women, including Jennifer Hawkins. Appellant began telephoning Jennifer shortly

after his arrest. During these calls, appellant told Jennifer he had been at Clyde's house when the crime occurred and that he had gone there to use a typewriter. Appellant said he had taken a shower, after which Clyde made a homosexual pass at him. Appellant refused and so Clyde hit him in his bad knee, causing appellant to fall to the floor, whereupon Clyde continued his sexual attack. Appellant grabbed a brick and hit Clyde in the head and then went into the other room to get dressed. Clyde pursued appellant and pushed him on the bed. Appellant hit him again, took his car keys and drove away in Clyde's car. When Jennifer asked appellant why no one woke up with all the screaming and yelling going on, appellant had no answer. When she asked appellant about the fire, he told her he had intentionally started it because he was scared. Appellant did not tell her he was raped.

Appellant also telephoned Suzanne Garcia. He told her that he was sitting on a couch when Clyde told him to come into his room. Appellant said no. While appellant was trying to put on his pants, Clyde pushed him over and said, " ' "You're not leaving until I tell you you can leave." ' " Clyde took appellant to his bedroom and threw him on the bed. They were wrestling and appellant grabbed a brick from the floor and hit him. Appellant told Suzanne the fire was accidentally started when he "grabb[ed] something from the fireplace."

Appellant telephoned Christine Turner from jail on approximately 20 occasions. When they talked about the crime during their conversations appellant never said "anything to [her] about self-defense" or "about someone attacking him." In a letter to Christine he denied killing Clyde and wrote that some other unnamed individual killed him.

Appellant also called Melissa and Bridgette in Colorado. He told Melissa that he had got into a "little fight" with "some guy." He told Bridgette that " 'he got into this really big fight, and the guy was hurt a little bit.' " He did not mention a homosexual attack to either girl.

Appellant spoke to Roger after Roger had been released from custody, telling Roger that he would have to tell the officers he was with appellant when appellant went up to Clyde's house and that Clyde held a knife to appellant's throat and forced appellant to have sex with Clyde. Roger told appellant he would not lie for him. Appellant said that if he did not, he would "get" Roger.

After the preliminary hearing in this matter, Roger was placed in a holding cell. Appellant was accidentally allowed to enter the cell for a moment, at which time he nodded his head and smiled at Roger, saying, " 'Now you're mine.' "

B. *The Defense*

Appellant sought to impeach the credibility of Roger and Henry and establish that Clyde was a homosexual.

i. *Evidence concerning Clyde's alleged homosexuality*

Robert Johnson, the neighbor who helped Danielle drag Clyde from the burning house, testified that he asked Danielle whether anyone else was in the house. In response, Danielle told him that her father had a friend over that evening. She said "that sometimes her dad's friend either slept on the couch or in her dad's bed, and that he smoked in bed." Danielle thought the friend might have fallen asleep with a cigarette and accidentally started the fire.

Michael Tapia testified that while he was in Las Vegas with Clyde he voluntarily sodomized Clyde on two or three occasions at Clyde's request. However, Michael refused to describe the sexual acts he performed with Clyde and, under cross-examination, changed his testimony as to when these acts occurred. Michael also testified that at one point during the trip he refused to sodomize Clyde, and Clyde accepted the rebuff without acrimony. Prior to the preliminary hearing, Michael told Morales that Clyde had never touched him sexually.

At trial, Mark refused to answer questions about his alleged sexual activities with Clyde. However, during the preliminary hearing Mark testified that while he and Clyde were in Las Vegas, Clyde put a condom on Mark and orally copulated him. Mark also testified that Clyde paid him to sodomize Clyde approximately once per week for a couple of months. Mark had also testified that Clyde never forced himself upon him. Prior to the preliminary hearing, Mark told Morales that there was no sexual contact between them and that Clyde had not tried to touch him sexually.

In rebuttal, Clyde's wife and Mike Wilder (hereafter Wilder), a man whom Clyde had employed during a period of years beginning when Wilder was 17 years old and with whom Clyde had traveled, testified that Clyde was heterosexual.

The defense also brought out the fact that some condoms were found in the trunk of Clyde's car and that both Michael and Mark testified that Clyde had put condoms on them prior to the claimed acts of sodomy or oral copulation. The prosecution offered another explanation for the presence of the condoms; Jean testified that because she suffered from vaginal infections Clyde used a condom when they had sexual intercourse.

Finally, the defense focused on the positive finding on the penile swab taken as part of Clyde's autopsy. This finding is consistent with sexual arousal prior to death. However, an expert pathologist testified that seminal leakage, like bowel or urinary leakage, often occurs as a result of relaxation of the prostate and is "unrelated to any type of premortem sexual activity or stimulation."

ii. *Impeachment*

a. *Impeachment of Roger*

Roger testified that he has been hospitalized in Napa State Hospital and that he started taking medication for "some mental problems" at approximately 16 to 17 years of age.

George Grunwald, a psychiatric social worker at the California Medical Facility at Vacaville, testified that in June of 1991 he diagnosed Roger as suffering from major depression. Roger had told him he was in the facility because he murdered his stepfather when he was 14 years old. This story was a complete fabrication. Roger admitted his statement to Grunwald was untrue but explained that he made up the story to "throw the other inmates off" so they would not know he was testifying against appellant.

Robert Cummings, a psychiatrist at Vacaville, testified that during the summer of 1991 he made a probable diagnosis of Roger as schizophrenic.

Yvonne Ferguson, a psychiatrist unaffiliated with Vacaville, testified that she had reviewed Roger's psychiatric records. She believes that Roger was possibly pretending to have a mental illness, but from the records she was unable to determine whether Roger suffers from schizophrenia.

Cliff Webb, the defense investigator, testified that Roger told him he had memory lapses, hallucinated, and stated there were times when he could not tell the difference between what was real and what he had imagined.

Oscar Pavlich, his wife Evelyn, and her daughter Natalie, testified that when Roger visited them on February 12, 1989, he told them he and appellant jointly owned Clyde's car and they were going to Colorado. Evelyn testified that Roger "flashed" Clyde's credit cards as his own, saying they belonged to his father. Roger told Evelyn that he would take Natalie shopping and told Natalie he would buy her and her friend an outfit. Natalie also testified that Roger told her " 'We got in a fight with a nigger,' " and that he had " 'nearly killed him,' " while taking some bloody clothes out of the trunk of Clyde's car.

Donna Yancy testified that Roger showed her Clyde's credit cards. He told her he was taking Natalie shopping, asked her if she wanted anything and offered her one of the cards.

### b. *Impeachment of Michael Henry*

Henry has twice been convicted of child molestation. During cross-examination, he denied working as a prostitute. However, William Digilio testified that Henry had worked as a male street prostitute.

Howard Lambert testified that Henry lived with him for a time and later he let Henry live in an apartment he owns. Lambert testified that while Henry was living in the apartment he stole rent money from tenants in the other units. Lambert also said that Henry "likes to embellish." During cross-examination, Henry had denied stealing the tenants' money, contending he and Lambert had disputed this issue.

### C. *Penalty Phase*

Since the jury returned a verdict of life imprisonment without possibility of parole, discussion of evidence pertaining to the determination of the appropriate penalty is unnecessary.

### DISCUSSION

### 1. *Was the denial of appellant's Wheeler motion prejudicial error?*

We answer the question in the affirmative.

Appellant assigns as error the trial court's denial of two motions made pursuant to *Wheeler, supra,* 22 Cal.3d 258, arguing the lower court "failed to evaluate the legitimacy of the reasons for each of the prosecutor's challenges." This argument is persuasive for, as will be shown below, the record clearly demonstrates the trial court misunderstood the nature of its obligations under *Wheeler* and did not undertake the required inquiry and evaluation of the prosecutor's stated reasons for the exercise of peremptory challenges to three prospective jurors.

### a. *Factual background*

In relevant part, the prosecutor exercised peremptory challenges to prospective jurors Tessie Raping, Gustavo Rodriguez and Antonio Campos. Immediately after the prosecutor challenged Mr. Rodriguez, defense counsel made his first *Wheeler* motion, arguing that the prosecutor "is selectively excluding people who are Hispanic or of certain minority background.

"Mrs. Raping was Filipino, was excluded earlier by him. This man is a Hispanic and has been excluded.

"I don't think there's anything that sets them apart by their answers that would justify his excusing them for cause. I think he's making a concerted effort to exclude people who are Hispanics or who may be in line with Hispanics because of their minority status."

The prosecutor offered to "go into chambers and justify it [the challenges] from my notes to the court why we're doing it." The court responded, "Why don't you go get your notes." The prosecutor explained his challenge to Mr. Rodriguez as follows:

"Okay. According to my notes of the jury rating system that I have, the principal reason for my excusing Mr. Rodriguez is that he made a very strong effort last time we talked to him to get himself excused for medical reasons. It indicated that he had reinjured his knee since the last time he sat through the hardship.

"I have a basic rule that any juror who, for any reason, doesn't want to sit on a case I should excuse that juror pretty much irrespective on account of past experience. I've found that a juror who is not wanting to sit will not make a good juror, will not make an attentive juror, most often than not will make a juror that will go counter any other juror.

"From his questionnaire, also, Mr. Rodriguez struck me as a person who's extremely verbose and very pretentious.

"I did not think he would fit in with the rest of the panel."

The court responded:

"Would it affect your decision at all if I told you that I had another letter in there where he had sought to be excused and a doctor had tried to excuse him, and I will get that letter right now and show it?" Defense counsel objected to the court's reference to this letter:

"Well, your honor, I think that the court is acting as an ally to [the prosecutor], helping him with the reasons that he is excusing.

"I wasn't aware of that record—or that letter. He wasn't aware of that letter. I don't think the court should do that. I object to the court bringing the letter incident up.

"THE COURT: The point—*it may be anti Wheeler,* but the point is, I made a decision this morning after reviewing this letter to not excuse him, and I

was going to based on this other letter which I—you folks don't have any knowledge of, but in terms of it became a much closer question in terms of excusing him because this letter from this doctor, which neither of you have seen, but in terms of what he says, not wanting to serve, I wanted to tell you since I knew that he had got a letter from his doctor that I hadn't rejected in my own mind but have not presented it to you, either, but I think you have a right to see that letter if you want to see it.

"But anyway, what are your other Wheeler things, if any?

"MR. KORDELL[7] [prosecutor]: That's it.

"MR. BAZAR [defense counsel]: Well, your honor, just in response, I think we have at least half the jurors, including some of the people that are here, didn't want to sit. If Mr. Kordell is indicating that he's kicking anybody who indicated at some point in time that they didn't want to sit off, I don't think he's being—well, I don't think he's being honest based on who's up there right now.

"MR. KORDELL: I'm not indicating that.

"MR. BAZAR: But I thought he justified it by saying that's my practice to kick anybody who doesn't want to sit off, and this guy doesn't want to sit.

"THE COURT: Let the record reflect this is the only guy up there with crutches. I mean, this man has a different problem than the other people.

"I find the Wheeler motion as to Mr. Rodriguez—there are a number of Hispanic people up there, and as to Mr. Rodriguez, *there certainly is more than good cause for the exercise of a peremptory challenge by either of you.*

"MR. KORDELL: You know, to go on the record to tell the truth, I should—I had not even been looking at the surnames or the color of the people up there.

"I have a rating system that I've worked out irrespective to any of that. I have no idea how many are there now or how many are coming up.

"I think counsel is a lot more sensitive to that issue than I am, and I think for obvious reasons.

---

[7]Based upon the content of the ensuing discussion it is clear the court reporter erroneously reversed the names of Mr. Bazar and Mr. Kordell. For convenience, we have corrected this error in the text of the record quoted above.

"MR. BAZAR: That could be very well true that I'm very apprehensive that he might attempt to kick off all Hispanics. I've just put a motion on to that effect on the record. I do believe he is, and we'll see.

"THE COURT: Okay, thank you. That motion is denied at this time." (Italics added.)

The court declined to hear defense counsel's arguments concerning the prosecutor's peremptory challenge to Mrs. Raping, ruling that "we'll hear from Mrs. Raping the next time you approach before we finally put the jury in to see what your justification is for Mrs. Raping."

After the prosecutor challenged Antonio Campos, defense counsel renewed his *Wheeler* motion. Thereupon, the court stated:

"I said something that I should not have said the last Wheeler motion, and that was that I had this letter that I had disclosed to you, and I apologize to you for not disclosing, but I didn't want you to think that I was teaming up with him.

"But it was just clear—that last Rodriguez fellow, it was just clear to me that he was way out on the end in terms of wanting to serve, especially with his crutches and his problems.

"So my comments were not meant in any way to side with the prosecution on that, but it was clear that he was hurting, or I shouldn't—it was clear he was limping and had crutches, and he was the only one who did.

"Proceed, Mr. Kordell.

"MR. KORDELL: I take it that this is as to Mr. Campos.

"My notes indicate that Mr. Campos was one of the least educated people that we've looked at on this panel. On his questionnaire, he listed he had no education at all.

"He indicated on question 82 where the court asked him what, if anything, he wanted to bring to the court's attention, he specifically pointed out in the questionnaire, he indicated he did not understand the questionnaire.

"Mr. Campos, when we were talking to him in camera, appeared not to understand what was going on about jury selection.

"With respect to a lot of his questions, he was inappropriate. Questions—I have a note here that questions 47, 61, 62 and 71 are all questionable or contradictory.

"One thing he said in chambers to us was I have no experience at all in this type of thing, and he indicated, also, some of the questions I didn't understand so I just skipped through them.

"I think Mr. Campos would be very impaired as far as his ability to understand his duty as a juror, in questionnaires, and some of the testimony we're going to have, also."

"THE COURT: Mr. Bazar?

"MR. BAZAR: Mr. Campos indicated some difficulty in understanding, but he clearly understood when he was questioned.

"None of the jurors that I recall in any of the panels that we saw had ever sat on a capital murder case before, so nobody has done this before.

"Mr. Campos represents a significant segment of our community. He may be less educated than some individuals, but I think that's a smoke screen and that it's a euphemistic way of pointing to his status as a agricultural worker of Hispanic background, and I object to his being excluded.

"THE COURT: I'm going to deny the Wheeler motion based on Mr. Campos. Mr. Campos is—when he was questioned, there were a few people I remember, and ironically enough, two of 'em are Rodriguez and Campos.

"And in terms of their—Mr. Campos, I remember just not being able to state an opinion when it came to the question of the death penalty.

"*I frankly—I don't know if I'm allowed to use this as a standard, but I—from a prosecution viewpoint or a defense viewpoint, he would be a bad juror from anybody's viewpoint, from a neutral person.* He just doesn't understand what's going on, and he doesn't—he has a terribly difficult time making a decision, and I had some concern about whether or not he'd be able to exercise his independent judgment even on the jury because he was so ambivalent during the questioning and so uneducated, not just in the sense that he's uneducated, lots of people are uneducated, but he wasn't—he was, at least appeared to me, to be on the low side of his intellectual ability, not just that he hadn't been educated, but he didn't have much intellect to educate, and his ability to function as a juror was substantially impaired in that regard, not so much so that he would have been an inappropriate juror, but certainly somebody who someone could kick off the jury based on that, and that's what Mr. Kordell did.

"Do you want to hear from this other lady?

"MR. BAZAR: Mrs. Raping?

"MR. KORDELL: The strongest point in my deciding to excuse—or rather, to exercise a peremptory in favor of Mrs. Raping was her vote on the death penalty. She was flat against the death penalty.

"Also, she answered yes as to questions 78 through 81 in a contradictory manner indicating to me that she did not understand those key questions regarding how she would vote for life in prison without parole or the death penalty.

"She'd also indicated, as a private matter, that she had been previously arrested for being an accessory to a crime, although that had been dismissed. That was a matter that she felt she wanted to keep under wraps.

"But the single strongest thing was the fact that she voted against the death penalty.

"THE COURT: I find that *there was good cause*, you know. *I frankly should be cited, and I'd like someone to do this; I would like the standard, the legal standard which I'm to apply in order to re-evaluate this after I've read the Wheeler case but to make sure that I'm applying the right standard. So I'd like that just before—or after we break. I think I'm applying the right standard, but I haven't researched that case.*

"MR. BAZAR: *I'll supply that to you.*

"THE COURT: *All right. Thank you.*" (Italics added.)

During afternoon session that same day, the following exchange occurred:

"MR. KORDELL: . . . One other observation I'd like to make, not exactly on this subject matter, but just so the record is clear on it, if it isn't clear to any reviewing court, with respect to Counsel's Wheeler challenges previously mounted, the record should reflect that the last two jurors, the alternate jurors that Counsel disqualified by way of peremptory were Hispanic surnamed. There was also by the name of Gonzales who was disqualified by Defense. That's just for the record.

"THE COURT: You're not making a Wheeler motion against him then for—

"MR. KORDELL: Well, were the law a little bit more reciprocal, I think I'd have a perfect right to, but, as we know, the law is far from reciprocal.

"MR. BAZAR: I don't know that the law is far from reciprocal. If he thinks he can mount a Wheeler challenge and you think it's meritorious and I am remiss in my justification for kicking off those jurors, the same sanction would apply as against him. It would be a mistrial. We would have to begin anew. If he thinks he's got such a challenge, I invite him to make it, but I doubt that he will. I don't think he's got such a challenge here.

"THE COURT: *Did I use the right standard in the ruling of the Wheeler motion that I—did I articulate the right standard?*

"MR. KORDELL: I believe the Court did." (Italics added.)

Defense counsel did not respond to the court's query. Rather, counsel argued the prosecutor's "comments seem to reduce in importance the role of an alternate juror." There is no indication in the record defense counsel ever supplied the court with the "right standard," as he had agreed to do during the morning session.[8]

As finally impaneled, the jury included two individuals with Hispanic surnames.

b. *Applicable legal principles*

■ " '[T]he Constitution forbids all forms of purposeful racial discrimination in selection of jurors.' [Citation.] A defendant has the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria. 'Purposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure.' [Citation.] When systematic exclusion occurs, the defendant is harmed, the excluded jurors are harmed, and the community is harmed because the public confidence in the fairness of our system of justice is undermined. [Citation.]" (*People v. Gore, supra,* 18 Cal.App.4th at p. 700.)

■ Peremptory challenges "have historically served as a valuable safety valve in jury selection." (*People v. Johnson* (1989) 47 Cal.3d 1194, 1215 [255 Cal.Rptr. 569, 767 P.2d 1047].) Their purpose "is to allow a party to exclude prospective jurors which the party believes may be consciously or unconsciously biased against him or her." (*People v. Jackson* (1992) 10 Cal.App.4th 13, 17 [12 Cal.Rptr.2d 541].) ■ In California, the principles applicable to systematic exclusion of jurors were first articulated in the

---

[8]Defense counsel renewed his *Wheeler* motion after the prosecution exercised a peremptory challenge to prospective juror Manuel L. Pimental after it was discovered he had lied on the questionnaire. The motion was summarily denied by the trial court. Appellant does not raise the propriety of the denial of this motion as an issue on appeal, nor does either party address this event in their briefs.

California Supreme Court case of *Wheeler, supra,* 22 Cal.3d 258. In *Wheeler,* the Supreme Court "held that peremptory challenges may not be used to remove prospective jurors solely on the basis of presumed group bias. We defined group bias as a presumption that certain jurors are biased merely because they are members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds." (*Johnson, supra,* 47 Cal.3d at p. 1215; *Gore, supra,* 18 Cal.App.4th at p. 700.) Peremptory challenges are permissible only if they are based on specific bias, defined in *Wheeler* as "a bias relating to the particular case on trial or the parties or witnesses thereto." (*Wheeler, supra,* 22 Cal.3d at p. 276.)

■ "We begin with the proposition that in any given instance the presumption must be that a party exercising a peremptory challenge is doing so on a constitutionally permissible ground." (*Wheeler, supra,* 22 Cal.3d at p. 278.) However, this presumption is rebuttable.

"[I]f a party believes his opponent is improperly using peremptory challenges for a discriminatory purpose, he must raise a timely challenge and make a prima facie case of such discrimination. Once a prima facie case has been shown, the burden shifts to the other party to come forward with an explanation that demonstrates a neutral explanation related to the particular case to be tried." (*People* v. *Johnson, supra,* 47 Cal.3d at p. 1216.) Once a facially neutral explanation has been given, the trial court is required to: "satisfy itself that the explanation is genuine. This demands of the trial judge a sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circumstances of the case as then known, his knowledge of trial techniques, and his observations of the manner in which the prosecutor has examined members of the venire and has exercised challenges for cause or peremptorily, for 'we rely on the good judgment of the trial courts to distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination.' [Citation.]" (*People* v. *Hall* (1983) 35 Cal.3d 161, 167-168 [197 Cal.Rptr. 71, 672 P.2d 854].) Thus, "the trial court must determine not only that a valid reason existed but also that the reason actually prompted the prosecutor's exercise of the particular peremptory challenge." (*People* v. *Fuentes* (1991) 54 Cal.3d 707, 720 [286 Cal.Rptr. 792, 818 P.2d 75]; *People* v. *Hall, supra,* 35 Cal.3d at p. 168.)

■ As explained in *People* v. *Jackson, supra,* 10 Cal.App.4th 13: "In ruling on a *Wheeler* motion, a trial court has no 'range' of options. If the prosecutor's explanation is disbelieved then the court must grant the motion and begin jury selection anew. (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 282.) Conversely, if the trial court finds the prosecutor's explanation credible and supportive of his or her peremptory challenges independent of group

bias, the court must deny the motion as was done here. Once the factual issue is decided, the trial court's disposition of the motion is mandatory, not discretionary." (*Id.* at p. 22, fn. omitted.)

█ When "reviewing *Wheeler* rulings, the appellate court must consider whether the trial court has made 'a sincere and reasoned determination regarding the genuineness of the prosecutor's reason.' [Citations.] If it appears that the trial court did not actually make such an inquiry, the ruling cannot be upheld." (*People* v. *Jackson, supra,* 10 Cal.App.4th at p. 23.) The reviewing court is to give "great deference to the trial court's determination that the use of peremptory challenges was not for an improper or class bias purpose." (*People* v. *Johnson, supra,* 47 Cal.3d at p. 1221.) "[T]he 'great deference' standard of review is an application of the substantial evidence test." (*Jackson, supra,* 10 Cal.App.4th at p. 19.)

Systematic exclusion of a particular ethnic group is "prejudicial per se." (*Wheeler, supra,* 22 Cal.3d at p. 283.) When the Supreme Court has found this error, "the judgment[ ] must . . . be reversed and the cause remanded for a new trial." (*Ibid.*)

c. *Analysis*

As discussed above, the trial court's obligation is one of "inquiry and evaluation." (*People* v. *Hall, supra,* 35 Cal.3d at p. 168.)[9] Once the prosecutor has stated his or her reasons supporting the exercise of the questioned peremptory challenge, the court must undertake a "sincere and reasoned attempt to evaluate the prosecutor's explanation," in order to determine whether the stated reasons are genuine. (*Hall, supra,* 35 Cal.3d at p. 167; *People* v. *Johnson, supra,* 47 Cal.3d at p. 1216.)

█ Here, close analysis of the record reveals that the trial court was not only unfamiliar with the applicable legal principles discussed above but that it actually utilized the wrong standard, determining there was objective "good cause" to excuse the prospective jurors. There is absolutely no indication the trial court ever evaluated whether *the prosecutor's* stated reasons for his challenges of Mr. Campos and Mrs. Raping were genuine and not a "sham" shielding group bias. In fact, there is no indication in the record that the trial court understood the difference between group and individual

---

[9]It is undisputed that the trial court made an implied finding that defense counsel had made the required prima facie showing when the court inquired about the prosecutor's justifications for the three contested challenges. (*People* v. *Fuentes, supra,* 54 Cal.3d at p. 716.)

bias, much less that it had this distinction in mind when ruling on appellant's *Wheeler* motions.[10]

While the Supreme Court's most recent rulings indicate a greater willingness to affirm a trial court's *Wheeler* determination despite an "oversight" (*People* v. *Sims* (1993) 5 Cal.4th 405, 431 [20 Cal.Rptr.2d 537, 853 P.2d 992]) or mistaken belief concerning the applicable law (*People* v. *Montiel* (1993) 5 Cal.4th 877, 911 [21 Cal.Rptr.2d 705, 855 P.2d 1277]), there has been no published California case in which a reviewing court has affirmed a lower court's *Wheeler* ruling where, as here, the trial court resolved the issue based upon the wrong legal standard, without even considering the criteria upon which the decision is properly based.

When considering defense counsel's *Wheeler* motions, the trial court repeatedly indicated that it was not aware of the applicable legal standard. In considering the *Wheeler* motion resulting from the challenge to Mr. Rodriguez, the court stated that revealing it had received a letter from Mr. Rodriguez's doctor may be "anti Wheeler"; yet, the court chose to do so without first determining whether such action was permissible. Next, while denying the motion brought after the challenge to Mr. Campos, the court said, "I frankly—I don't know if I'm allowed to use this as a standard, but I—from a prosecution viewpoint or a defense viewpoint, he would be a bad juror from anybody's viewpoint, from a neutral person." Finally, when ruling on the motion resulting from the challenge to Mrs. Raping, the court actually went so far as to ask counsel to supply him with the "standard, the legal standard which I'm to apply." However, before the standard was supplied to the court (or the court researched the issue for itself), it denied the motion. Then, during the afternoon session, the court asked counsel, "Did I use the right standard in the ruling of the Wheeler motion that I—did I articulate the right standard?" Although the trial court had indicated prior to the lunch break it intended to read the *Wheeler* decision, this question demonstrates that it failed to do so.

Next, contrary to the prosecutor's immediate assurance that the court had utilized the right standard, it had not. Rather than inquiring into and determining whether the prosecutor's reasons for the challenges were genuine and actually prompted each of the contested challenges, the trial court simply considered whether the challenges were objectively supported by "good cause."

The prosecutor stated that he challenged Mr. Rodriguez because Mr. Rodriguez did not want to sit on a jury, was pretentious and would not fit in

---

[10]Respondent's argument on this issue is nonresponsive since it failed to address appellant's central contention that the trial court did not undertake the required inquiry into the genuineness of the prosecutor's reasons.

with the rest of the jury. Defense counsel argued that the prosecution had not excused other jurors in the panel who did not wish to serve. In ruling on this motion, the court found "there are a number of Hispanic people up there, and as to Mr. Rodriguez, there certainly is more than good cause for the exercise of a peremptory challenge by either of you." The court did not consider or address the prosecutor's statements regarding Mr. Rodriguez's personality. The court also did not consider whether the prosecutor's claimed policy of challenging individuals who did not wish to serve had been applied consistently throughout voir dire, although defense counsel argued the prosecution had not adhered to this alleged "basic rule."

The prosecutor told the court that he rejected Mr. Campos because he was uneducated, had said that he did not understand the questionnaire filled out by each of the prospective jurors and did not answer some of the questions contained therein, and did not appear "to understand what was going on about jury selection." Rather than addressing the reasons given by the prosecutor, the trial court stated that Mr. Campos was unable to give an opinion about the death penalty, had difficulty making a decision and appeared to be intellectually impaired. The court said that "from a prosecution viewpoint or a defense viewpoint, he would be a bad juror from anybody's viewpoint, from a neutral person." Clearly, the trial court did not consider either the genuineness of the reasons given by the prosecutor for excusing Mr. Campos or defense counsel's response that the stated reasons demonstrated group bias against less educated Hispanic agricultural workers; rather, the trial court addressed the issue from the objective viewpoint of whether it thought Mr. Campos would be a "bad" juror.

Finally, the prosecutor gave three reasons for his challenge of Mrs. Raping. He asserted that she "was flat against the death penalty," that she answered questions 78 through 81 of the questionnaire in a contradictory manner and that she had been previously arrested. "But the single strongest thing was the fact that she voted against the death penalty." Again, the court did not question the prosecutor about these stated justifications nor does it appear that it reviewed Mrs. Raping's questionnaire or asked for a reading of her voir dire in order to determine for itself whether these assertions were supported by the record. Moreover, defense counsel was not given an opportunity to respond to the stated justifications. Rather, without addressing any of the prosecutor's three stated reasons, the court simply found there existed "good cause" to challenge Mrs. Raping.

The foregoing demonstrates the trial court was completely unaware of its obligations under *Wheeler*. ■ While the trial court is not required to specifically inquire of the prosecutor whether his reasons are "genuine"

(*People* v. *Johnson, supra,* 47 Cal.3d at p. 1222), if a *Wheeler* ruling is to be affirmed the record must demonstrate that the court considered whether the prosecutor's stated reasons were valid and actually prompted the challenge. (*People* v. *Fuentes, supra,* 54 Cal.3d at p. 720.) It must be clear "the court understood the distinction between specific and group bias and had that distinction in mind when it made its ruling." (*Johnson, supra,* 47 Cal.3d at p. 1222.) ■ Here, rather than determining whether the prosecutor challenged these three jurors because of genuinely held, valid and nondiscriminatory reasons, the court essentially asked itself whether it objectively thought Mr. Rodriguez, Mr. Campos and Mrs. Raping would be good jurors, and based its rulings on this determination alone. Moreover, the trial court's failure to consider or address defense counsel's assertion that the prosecutor's stated reasons for excluding Mr. Campos demonstrate an intent to remove uneducated Hispanics indicates that it did not have the distinction between specific and group bias, which includes a bias against day laborers, in mind when it made the disputed rulings.

Since the trial court repeatedly stated it was not familiar with the requirements set forth in *Wheeler* and subsequent cases and it is apparent from the record it did not obtain such knowledge, this court cannot find the "good cause" rulings are the functional equivalent of a finding the prosecutor's reasons were genuine and not based on group bias.

In certain crucial respects the trial court's error is analogous to that committed by the lower court in *People* v. *Fuentes, supra,* 54 Cal.3d 707, correctly relied upon by appellant. In *Fuentes,* our Supreme Court determined that the trial court "did not satisfy its *Wheeler* obligation of inquiry and evaluation, and the judgment must therefore be reversed." (*Id.* at p. 718.) There, defendant Jose Leon Fuentes was convicted of first degree murder, attempted robbery and automobile theft. During voir dire the prosecutor exercised 19 peremptory challenges, 14 of which were against Blacks. As finally constituted, the jury included three Black jurors and three Black alternates. The defense made several objections on *Wheeler* grounds. After implicitly ruling the defense had established a prima facie case of group bias, the prosecutor offered "a multitude of purported reasons—as many as a dozen or more in most cases—to justify his challenge of each juror." (*Id.* at p. 712.) Following "the prosecutor's rambling attempt to explain his challenges, the court took defendant's *Wheeler* motion under submission," denying it the next morning. (*Id.* at p. 713.) Despite ruling that no prima facie showing had been made, the court examined the prosecutor's reasons for excusing the 14 Black jurors. "Addressing the challenged jurors as a group, the court found that some of the prosecutor's excuses were 'totally unreasonable' and others 'very spurious.' The court also stated, however, that

there were 'some good reasons' for the prosecutor's challenges . . . ." (*Ibid.*) Except for one juror, the trial court did not indicate which of the purported " 'good reasons' applied to which jurors." (*Ibid.*)

The Supreme Court in *Fuentes* held the trial court had failed to satisfy its responsibilities as set forth in *People v. Hall, supra,* 35 Cal.3d at page 167. The court reasoned that the failure of the trial court to relate its findings that the prosecutor's reasons were neutral to particular challenged jurors demonstrated it did not undertake a "truly 'reasoned attempt' " to evaluate the prosecutor's explanations, writing:

"In summary, the trial court took the first step in the evaluation process. It determined which of the myriad justifications cited by the prosecutor were sham and which were bona fide. However, a truly 'reasoned attempt' to evaluate the prosecutor's explanations [citation] requires the court to address the challenged jurors individually to determine whether any one of them has been improperly excluded. In that process, the trial court must determine not only that a valid reason existed but also that the reason actually prompted the prosecutor's exercise of the particular peremptory challenge.

"We reiterate that the trial court is in the best position to determine whether a given explanation is genuine or sham. For that reason, we continue to accord great deference to the trial court's ruling that a particular reason is genuine. [Citation.] In this case, however, the trial court failed to take the next, necessary step of asking whether the asserted reasons actually applied to the particular jurors whom the prosecutor challenged. For this reason, we are compelled to reverse the judgment of death." (*People v. Fuentes, supra,* 54 Cal.3d at pp. 720-721.)

Here, while the trial court did consider the challenged jurors on an individual basis, like the trial court in *Fuentes,* it too failed to "undertake a 'reasoned attempt' to evaluate the prosecutor's explanations." (54 Cal.3d at p. 720.) The court never considered the genuineness of the prosecutor's reasons, just finding there was objective "good cause" for the challenges. In the cases of Mr. Campos and Mrs. Raping, the court did not even analyze the reasons given by the prosecutor, but instead found its own reasons to support the challenge of Mr. Campos and undertook no analysis at all as to the challenge of Mrs. Raping.

*People v. Turner* (1986) 42 Cal.3d 711 [230 Cal.Rptr. 656, 726 P.2d 102] is also illustrative. In *Turner,* the Supreme Court reversed the defendant's murder conviction, based upon the finding that the prosecutor's use of peremptory challenges was racially motivated. However, the high court

determined not only that the prosecutor's reasons were inadequate but that this inadequacy "was compounded by the court's apparent acceptance of those reasons at face value." (*Id.* at p. 727.) The court wrote that the trial court failed "in his duty to carefully evaluate the prosecutor's proffered explanations for these challenges in light of all the circumstances of the case." (*Id.* at p. 715.) The high court found: "In each instance the court listened to the prosecutor without question and promptly denied the motion without comment. As we have seen, however, the prosecutor's explanations were either implausible or suggestive of bias. They therefore 'demanded further inquiry on the part of the trial court' [citation], followed by a 'sincere and *reasoned*' effort by the court to evaluate their genuineness and sufficiency in light of all the circumstances of the trial [citation]. Each step is 'imperative, if the constitutional guarantee is to have real meaning' [citation]." (42 Cal.3d at pp. 727-728; see also *People* v. *Hall, supra,* 35 Cal.3d 161, in which reversal was ordered because of the trial court's faulty understanding as to applicable law and strong evidence of group bias.)

The suggestion of group bias was much stronger in *Turner* than in the instant case, for here, review of the prosecutor's exercise of peremptory challenges does not lead to the inescapable conclusion that his decisions were racially motivated. However, as will be shown below, while the record supports the prosecutor's stated reasons for his challenges to Mr. Rodriguez and Mr. Campos, the prosecutor's "strongest" reason for challenging Mrs. Raping is not supported by the record and the trial court did not note this discrepancy and inquire further into the stated justifications supporting the challenge. ■ Thus, *Turner* is germane, for a "constitutional violation may arise even when only one of several members of a 'cognizable' group was improperly excluded." (*People* v. *Montiel, supra,* 5 Cal.4th at p. 909.)

■ The prosecutor declared that his strongest reason for excusing Mrs. Raping was her alleged absolute opposition to the death penalty. Contrary to this assertion, during voir dire, Mrs. Raping repeatedly stated that she could vote for either the death penalty or life imprisonment. Just as the prosecutor stated, her answers to the questionnaire were contradictory, for she wrote that "the law should not kill anybody," and that the death penalty should be mandatory for first degree murder. Considering both her oral and written statements, the most reasonable conclusion is that Raping was undecided about the death penalty, not "flat against" it as was asserted by the prosecutor. Here, as in *Turner*, the obvious contradiction between the prosecutor's representation as to Raping's opinion of the death penalty and her actual view required further inquiry and evaluation by the trial court to ensure that the prosecutor's inaccuracy was not demonstrative of group bias; the trial court's summary finding of "good cause" was inadequate. (*People* v. *Turner, supra,* 42 Cal.3d at pp. 727-728.)

In summary, *People* v. *Jackson, supra,* 10 Cal.4th at page 23, concisely states the controlling principle: "A trial court could not have made the proper factual inquiry unless it understood 'its obligation to evaluate the prosecutor's explanations' [citation] and also 'understood the distinction between specific and group bias and had that distinction in mind when it made its ruling.' [Citation.]" Careful analysis of the record here necessitates the conclusion that the trial court did not understand its obligation to evaluate *the prosecutor's* stated reasons supporting the three contested challenges. Further, the record does not support a determination that the lower court understood and had in mind the distinction between specific and group bias. Therefore, because the record clearly demonstrates "that the trial court misunderstood the nature of its obligations under *Wheeler,*" and based its ruling on "something other than a resolution of that factual issue," its rulings on defense counsel's *Wheeler* motions cannot be upheld. (*Ibid.*; *People* v. *Fuentes, supra,* 54 Cal.3d at p. 718.)

We will discuss the appropriate disposition of the case because of the *Wheeler* error later in the opinion.

2. *Was the admission of evidence concerning the plan to rob Tom erroneous?*

We answer the question in the negative.

■■■ "This case is another in a long series in which a defendant challenges the admission of a prior criminal act committed by him and the People seek to justify its admission by demonstrating that the prior act is relevant to prove something other than the defendant's general propensity to commit crimes." (*People* v. *Simon* (1986) 184 Cal.App.3d 125, 129 [228 Cal.Rptr. 855].) Here, appellant contends the trial court erroneously admitted Roger's testimony concerning a proposed plan to rob a man named Tom.[11] Appellant argues this uncharged robbery was dissimilar from the charged offenses. He also contends this evidence was cumulative because appellant admitted in statements to police that he intended to steal from Clyde. Finally, he asserts the potential for undue prejudice outweighed the probative value. As will be demonstrated below, these arguments are unpersuasive.

■■■ "Evidence that a defendant committed crimes other than those for which he is on trial is admissible when it is logically, naturally, and by reasonable inference relevant to prove some fact at issue, such as motive, intent, preparation or identity." (*People* v. *Daniels* (1991) 52 Cal.3d 815, 856 [277 Cal.Rptr. 122, 802 P.2d 906]; Evid. Code, § 1101, subd. (b).) However,

---

[11]See statement of facts for details of this testimony.

"[t]he admission of any evidence that involves crimes other than those for which a defendant is being tried has a 'highly inflammatory and prejudicial effect' on the trier of fact. This court has repeatedly warned that the admissibility of this type of evidence must be 'scrutinized with great care.' " (*People* v. *Thompson* (1980) 27 Cal.3d 303, 314 [165 Cal.Rptr. 289, 611 P.2d 883], fns. omitted.)

"[A]dmissibility depends upon three principal factors: (1) the *materiality* of the fact sought to be proved or disproved; (2) the *tendency* of the uncharged crime to prove or disprove the material fact; and (3) the existence of any *rule* or *policy* requiring the exclusion of relevant evidence." (27 Cal.3d at p. 315.) "The trial court must also determine that its probative value outweighs its prejudicial effect." (*People* v. *Simon, supra,* 184 Cal.App.3d at p. 129.)

When the defendant does not "dispute the fact of the prior act," but merely argues its legal inadmissibility, the issue presented is "solely a question of law." (184 Cal.App.3d at p. 129.) However, the trial court's determination that the probative value of the other crime outweighed its prejudicial effect is reviewed under the abuse of discretion standard. (*People* v. *Daniels, supra,* 52 Cal.3d at p. 858.)

 Appellant concedes the disputed evidence was "relevant and material" to establish "motive and plan." However, he first contends the plan to rob Tom was not sufficiently similar to the charged crime to permit its admission. He is mistaken.

 When the evidence of an uncharged offense "is introduced to prove intent, the prosecution need not show the same quantum of 'similarity' as when the uncharged conduct is used to prove identity." (*People* v. *Robbins* (1988) 45 Cal.3d 867, 880 [248 Cal.Rptr. 172, 755 P.2d 355].) Only substantial similarity is required. (*Ibid.*) Here, the similarities between the uncharged robbery and the charged offenses are numerous and substantial. The prosecutor aptly described the "striking similarities between these two plans" below:

"Secondly, if you look at it real carefully, what we're trying to point to here is an issue in dispute. The issue of intents. And the intent is to—in these particular way. Number one, to rob somebody. Number two to rob somebody by physical violence, by hitting him on the head. That was the plan with regard to Tom. That's what happened to Clyde Mayer.

"Secondly or thirdly, to rob somebody for the purpose of getting money and a car. And, fourthly, to rob somebody to get the money and the car to visit the girls in Colorado."

In sum, both crimes were motivated by the desire to obtain a car and money so appellant could go to Colorado and visit girls. Appellant planned to catch the victim unawares and hit him on the head, after which appellant was to take his wallet and car keys. Finally, both crimes contemplated escape to Colorado in the victim's car, with Roger accompanying appellant.

The only dissimilarities between the two are that the uncharged robbery contemplated involvement by two perpetrators, that appellant planned on hitting Tom on the head with a bicycle seat post, not a log or firebrick, and that appellant did not specifically intend to kill Tom, but rather was going to put him in the trunk of the car. In *People* v. *Robbins, supra,* 45 Cal.3d 867, the Supreme Court rejected defendant's argument that a difference in the method by which he strangled the victim in an uncharged murder rendered two incidents "insufficiently similar to support admission." (*Id.* at p. 880, fn. 4.) Likewise here, the differences to which appellant points are not significant.

Moreover, appellant's reliance on *People* v. *Rivera* (1985) 41 Cal.3d 388 [221 Cal.Rptr. 562, 710 P.2d 362], is misplaced. In *Rivera*, the uncharged crime was introduced to establish identity, not intent. Moreover, "the prior offense was a robbery at gunpoint; the charged crime was a 'snatch' burglary plus a stabbing," the object of the thefts differed and the coperpetrators in each case were different. (*Id.* at p. 393.) Here, the uncharged crime was the same as was the proposed method of disabling the victim. *People* v. *Williams* (1988) 44 Cal.3d 883, 908-909 [245 Cal.Rptr. 336, 751 P.2d 395], and *People* v. *Kronemyer* (1987) 189 Cal.App.3d 314, 347-348 [234 Cal.Rptr. 442], are also inapposite. In *Williams*, the court concluded the probative value of the crime was outweighed by its prejudicial effect based on the determination that there was no evidence defendant had ingested drugs or alcohol prior to the commission of the uncharged crime as was alleged in the charged offense, or that the amounts injected were the same. Here, there is no such disparity in appellant's mental state. In *Kronemyer*, it was determined that the evidence was irrelevant. Here, appellant concedes the materiality of the uncharged offense.

Appellant's argument that the evidence was cumulative also fails. While it is true that appellant ultimately admitted to the police he intended to rob Clyde, he repeatedly said that hitting him on the head was not part of his original plan, stating the intent to kill him arose only after the alleged

assault. However, the uncharged offense contradicts appellant's custodial statements and is relevant to demonstrate a preexisting plan to rob Clyde by hitting him on the head. As the prosecutor argued below, this evidence supported the conclusion that appellant intended to rob Clyde "by hitting him on the head." Thus, this evidence demonstrates appellant's "mindset to steal *and kill if necessary*, in order to get to Colorado . . . ." (Italics added.)

Finally, appellant argues evidence of the uncharged robbery should have been excluded pursuant to Evidence Code section 352. After considering arguments by counsel, and noting that this was a "close call," the trial court determined the probative value of this testimony outweighed any potentially undue prejudice. Appellant contends this determination constituted an abuse of discretion because the proffered testimony merely demonstrated a "propensity to rob."

This argument fails because, as discussed above, this evidence was highly probative. It contradicted appellant's statement to police that the intent to kill Clyde arose only after the alleged assault and demonstrated that prior to the time he arrived at the house appellant had seriously contemplated hitting someone on the head in order to obtain money and a car, thus supporting the conclusion that Clyde's murder was in furtherance of a preconceived plan to violently rob him and was not a spontaneous act. Moreover, the trial court protected appellant against undue prejudice by agreeing to admonish the jury as to the limited purpose for which this testimony was admitted. Thus, the trial court's determination did not constitute an abuse of discretion. (Cf. *People* v. *Beamon* (1973) 8 Cal.3d 625, 634-635 [105 Cal.Rptr. 681, 504 P.2d 905].)

Even were this court to determine admission of this testimony was improper, the resulting error was clearly harmless. The physical and testimonial evidence of appellant's guilt is overwhelming. Moreover, the homosexual rape which appellant claimed prompted the murder was physically improbable as described by appellant, and the physical evidence is inconsistent with all three of the statements appellant gave to Morales (and the various stories appellant gave to others). Thus, there is no reasonable possibility the jury would have reached a different verdict had the contested testimony been excluded. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836-838 [299 P.2d 243] [set applicable standard; held reversal was not required because the evidence "unerringly pointed to defendant's guilt"].)

3. *Was the refusal to give appellant's special instruction addressing "proximate causation" erroneous?*

 Appellant contends the trial court erred by refusing to give a special instruction requested below addressing "proximate causation."[12] We reject the contention for two reasons. First, a causal relationship between the charged felony, robbery in this case, and the killing of the victim, is not required in a felony-murder prosecution, provided the killing and the robbery are parts of a continuous transaction. As explained by the Supreme Court in *People* v. *Whitehorn* (1963) 60 Cal.2d 256, 264 [32 Cal.Rptr. 199, 383 P.2d 783]: "Where it is claimed that a murder is of the first degree on the theory that it was 'committed in the perpetration' of one of the felonies designated in section 189 of the Penal Code, the defendant is entitled, upon request, to a specific instruction directing attention to the necessity of proving the felony beyond a reasonable doubt even though a general instruction on reasonable doubt has been given. [Citations.] The proposed instruction, however, erroneously stated that before the felony-murder rule may be applied it must be shown that death ensued 'in consequence of the forcible rape.' Section 189 of the Penal Code has been construed as not requiring a strict causal relation between the felony and the homicide, and the homicide is committed in the perpetration of the felony if the killing and the felony are parts of one continuous transaction. [Citations.] Statements of the type contained in the proposed instruction are misleading and should not be used in giving instructions on the subject. Any language in *People* v. *Harrison* 176 Cal.App.2d 330, 335 [1 Cal.Rptr. 414], which could be understood as being in conflict with the views expressed herein is disapproved." (See also, *People* v. *Mason* (1960) 54 Cal.2d 164, 168-169 [4 Cal.Rptr. 841, 351 P.2d 1025]; *People* v. *Sellers* (1988) 203 Cal.App.3d 1042, 1053 [250 Cal.Rptr. 345].) Second, it has long been established that a trial court "is never required to give any instructions that would have had no foundation in the evidence or in any theory on which the case was tried." (*People* v. *Brunt* (1972) 24 Cal.App.3d 945, 955-956 [101

---

[12]The requested "Modification of CALJIC 8.55" states:

"To constitute felony-murder there must be, in addition to the death of a human being, proof of a robbery or burglary which was the proximate cause of that death.

"A proximate cause of death is a cause which, in natural and continuous sequence, produces the death, and without the death would not have occurred.

"If you find that the defendant's conduct was a proximate cause of the death of another person, then it is no defense that the negligent conduct of the deceased person contributed to the death.

"If, however, upon consideration of all the evidence, you believe an act of the deceased person was so extraordinary and unforeseeable, you may consider it to be the superseding cause of his death.

"In the event you believe the act of the deceased person is superseding, then the defendant's conduct would be a remote and not a proximate cause of the death."

Cal.Rptr. 457].) Because appellant did not rely on the theory embodied in the requested instruction at trial and the instruction was inconsistent with the defense presented below, the trial court's rejection thereof was proper. (*People* v. *Carter* (1957) 48 Cal.2d 737, 758 [312 P.2d 665]; *People* v. *Pic'l* (1981) 114 Cal.App.3d 824, 868-869 [171 Cal.Rptr. 106].)[13]

Appellant's contention that the requested "proximate" "intervening" and "superseding" cause of death instruction should have been given is necessarily premised on a preexisting felonious intent to rob Clyde at the time the victim's alleged assault on appellant took place. Inherent in this foundational premise is the assumption that defendant had not abandoned his plan to rob Clyde and steal his car prior to the assault for only if there was an operative intent to rob Clyde at the time of the sexual assault could the assault have been an intervening or superseding cause.[14] This crucial supposition is inconsistent with the defense presented below.

Appellant's trial defense was premised on the theory that the murder did not take place during the commission of a robbery, not because the assault was unforeseen and broke the chain of causation, but because appellant had no intent to rob Clyde or steal his car at the time he was assaulted. Defense counsel argued that appellant had abandoned his plan to rob Clyde when Danielle came home, prior to the sexual assault; hence, the murder did not occur during the commission of a robbery or burglary. During closing arguments defense counsel forcefully argued that when appellant "saw Danielle Mayer, he abandoned any plan that he had to commit a burglary or theft or anything of that nature. So at that point, he was no longer in the commission of a burglary or a robbery. . . . [¶] I'm not gonna steal anything from him. I'm not gonna fight him. I'm not going to do anything. Then the commission of that crime is over. . . . It's over." It was only after the commission of the murder that appellant suddenly resurrected his original plan to steal Clyde's car. In fact, counsel even argued that appellant did not steal Clyde's wallet from the dresser, but that Clyde had left it in his car.

Moreover, when the trial court was considering whether to give CALJIC No. 8.55 and the requested modification, defense counsel never raised the

---

[13]Both parties focus their arguments on the merits of the contested instruction and do not address whether the defense theory embodied by this instruction was consistent with the defense actually presented below. Although the People correctly note that the trial court "may properly refuse to give a requested instruction where there is no credible evidence to support it," and recognize that appellant argued below "the homicide was completely independent of the robbery and burglary," it does not explore the implications of these assertions and appellant does not respond to either of them.

[14]Morales's testimony that during appellant's February 14, 1989, statement appellant told Morales that he had contemplated abandoning his plan to steal Clyde's car after Danielle arrived home, but "later on decided to go ahead and go through with it," is the only evidence we can find in the record supporting the "intervening cause" theory.

"intervening cause" theory asserted on appeal. Defense counsel offered no argument in support of the requested instruction and did not refute the trial court's assertion that CALJIC No. 8.55 should only be given when the cause of death is disputed.

The prosecutor argued that no sexual assault had taken place; thus, the requested instruction is also inconsistent with the People's theory of the case.

*People* v. *Carter, supra,* 48 Cal.2d at page 758, is directly analogous. In *Carter,* the high court refused an instruction which apparently was requested by the defendant,[15] ruling: "Nor was there error in the court's failure to instruct that the homicide was not in the perpetration of a robbery if the intent to rob arose after the attack on the deceased. *At no time during the trial did defendant rely on the theory that such an instruction would have embodied.* He did not contend that he thought of robbing Carey only after attacking him; on the contrary he denied either attacking or robbing him." (48 Cal.2d at p. 758, italics added.)

Here, just as in *Carter,* appellant never relied on the theory embodied by the proffered instruction, namely a continuing plan to rob Clyde interrupted by the unforseeable sexual assault; on the contrary, appellant denied that he intended to rob Clyde at the time the alleged assault and murder occurred. Thus, as the requested instruction was inconsistent with the theory of defense presented below, the trial court's refusal thereof was proper.

*4. Was the refusal to give appellant's special instruction addressing intent to kill erroneous?*

We answer the question in the negative.

The jury was instructed with CALJIC No. 9.40, which defines the crime of robbery.[16] Appellant argues the trial court erred by refusing to give a defense instruction which added an additional paragraph to CALJIC No.

[15]*People* v. *Carter, supra,* 48 Cal.2d 737, does not explicitly state whether the defendant had requested this instruction be given below. However, the language of the opinion implies that the lower court had rejected the contested instruction and the cases relied upon in *Carter* address the refusal to give an instruction which had been requested by the defendant below. Moreover, *Carter* has repeatedly been relied upon in cases involving the denial of an instruction requested by the defendant below. (See, e.g., *People* v. *Roberts* (1992) 2 Cal.4th 271, 311-313 [6 Cal.Rptr.2d 276, 826 P.2d 274]; *People* v. *Brunt, supra,* 24 Cal.App.3d at pp. 955-956; *People* v. *Pic'l, supra,* 114 Cal.App.3d at pp. 868-869.)

[16]As given, this instruction provides: "Defendant is accused in count two of the information of having committed the crime of robbery, a violation of Penal Code section 211. Every person who takes the personal property in the possession of another against the will and from

9.40 stating that the prosecutor bears the burden of establishing that at the time of the application of force the perpetrator had the specific intent to permanently deprive the victim of his property.[17] Appellant argues the refusal of this instruction resulted in the failure to adequately instruct the jury on the necessity of joint operation of act and intent. The People contend there was no error because "the requested instruction was grammatically flawed and confusing . . . and the factual question intended to be covered by the instruction was covered by other properly worded instructions." As will be explained below, the latter contention is persuasive.[18]

■ The foundational underpinnings upon which this discussion is premised are concisely set forth in *People* v. *Maridan* (1975) 47 Cal.App.3d 16, 46 [121 Cal.Rptr. 269]: "A judge may select appropriate instructions from those submitted by the parties, with or without modification, or may use his own instructions. [Citations.] Each of the essential elements of a given case must be covered completely by the instructions given [citations] and it is a fundamental rule that all of the instructions must be read together [citations]: ' "Whether a jury has been correctly instructed is not to be determined from a consideration of parts of an instruction or from particular instructions, but from the entire charge of the court." ' [Citation.] On review, reversible error in the instruction of the jury may be found if and only if it affirmatively appears that the error was likely to have misled the jury."

■ Here, as in *People* v. *Whitehorn, supra,* 60 Cal.2d at page 265, "The court gave instructions which to a large extent covered the same subject matter of the one proffered by appellant." The jury was instructed with CALJIC No. 3.31, which provides, "there must exist a union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator. Unless such specific intent exists the crime to which it relates is not committed. [¶] The specific intent required is included in the definitions of the crimes charged." As given, CALJIC No. 9.40 states that one is guilty of robbery if one takes property by means of force *with* the specific intent to

---

the person or immediate presence of that person accomplished by means of force or fear and with the specific intent permanently to deprive such person of such property is guilty of the crime of robbery in violation of Penal Code section 211."

[17]The requested additional paragraph reads as follows: "It is the prosecution's burden to establish that at the time of the application of force or violence, or had [*sic*] the use of fear or intimidation, the perpetrator had the specific intent permanently to deprive such person of the property. If you have reasonable doubt as to whether the prosecution has met this burden, you may not convict the defendant of the charged offense."

[18]While a court is generally not required to correct improper instructions, "the failure of the court to give an adequate instruction will not necessarily be excused where the defect is an obvious one that can be easily corrected." (*People* v. *Whitehorn, supra,* 60 Cal.2d at p. 265.) The grammatical defect to which the People point could easily have been cured by the trial court; hence, this first argument is without merit.

deprive them of such property. The jury was also instructed on larceny, a lesser included offense which does not involve the application of force. Considering the charge as a whole, it is clear the jury was adequately instructed that in order to find appellant guilty of robbery it must conclude he killed Clyde with the specific intent to steal his personal property.

 The trial court need not give instructions which are covered by other properly given instructions. (60 Cal.2d at p. 265.) Contrary to appellant's argument, the jury was not inadequately instructed; rather, it simply did not believe appellant's claim that he had been assaulted and had killed Clyde for this reason alone. Accordingly, the trial court did not err by refusing to give the requested modification of CALJIC No. 9.40.

Finally, even had it been determined that the failure to give the requested instruction was erroneous, the resulting error was harmless. No essential element or defense was removed from the jury's consideration, nor was the jury misled. As discussed *ante* in part 2, this was not a close case. Thus, it is not reasonably probable that the jury would have reached a conclusion more favorable to the appellant had the requested instruction been given.

### REPLY TO DISSENTING OPINION

 Our dissenting colleague ventures on a journey no other American appellate judge has traveled, to the best of our knowlege. He seeks to affirm a criminal conviction, regardless of *prejudicial* constitutional error of the highest magnitude. As we will explain, such an endeavor can succeed only if the United States Constitution is turned on its head.

*Batson* v. *Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712], declares the Constitution forbids all form of purposeful racial discrimination in the selection of jurors. "Purposeful racial discrimination in [the jury selection process] violates a defendant's [Fourteenth Amendment] right to equal protection because it denies him the protection that a trial by jury is intended to secure." (*Id.* at p. 86 [90 L.Ed.2d at p. 80].) When systematic exclusion occurs, not only is the defendant harmed, but *the excluded jurors are harmed* and the *community is harmed* because the public confidence in the fairness of our system of justice is undermined. (*Id.* at p. 87 [90 L.Ed.2d at p. 81].) These principles underlying the right to a racially neutral jury have been consistently reaffirmed by the high court. (*Powers* v. *Ohio* (1991) 499 U.S. 400 [113 L.Ed.2d 411, 111 S.Ct. 1364]; *Edmonson* v. *Leesville Concrete Co.* (1991) 500 U.S. 614 [114 L.Ed.2d 660, 111 S.Ct. 2077]; *Georgia* v. *McCollum* (1992) 505 U.S. __ [120 L.Ed.2d 33, 112 S.Ct. 2348].) As recently as this year, in *J.E.B.* v. *Alabama* ex rel. *T.B.* (1994) 511 U.S.

__, __ [128 L.Ed.2d 89, 114 S.Ct. 1419, 1427], the high court wrote, "In recent cases we have emphasized that individual jurors themselves have a right to nondiscriminatory jury selection procedures."

Since *Batson*, the Supreme Court has also ruled a criminal defendant has *standing* to raise the third party equal protection claims of jurors excluded because of race. (*Powers* v. *Ohio, supra*, 499 U.S. at p. 415 [113 L.Ed.2d at p. 428].) "Both the excluded juror and the criminal defendant have a common interest in eliminating racial discrimination from the courtroom. A [prospective juror in the box] excluded from jury service because of race suffers a profound personal humiliation heightened by its public character. The rejected juror may lose confidence in the court and its verdicts, as may the defendant if his or her objections cannot be heard [on appeal]. This congruence of interest makes it necessary and appropriate for the defendant to raise the rights of the juror." (499 U.S. at pp. 413-414 [113 L.Ed.2d at p. 427]; see also *Edmonson* v. *Leesville Concrete Co., supra*, 500 U.S. at pp. 628-631 [114 L.Ed.2d at pp. 678-691].)

Thus, whether counsel knows it or not, when he rises to make a *Wheeler-Batson* objection during voir dire examination, he speaks not only on behalf of his client, but he speaks on behalf of those jurors who may be excluded from the jury for racial reasons as well as the community, if his objection is not resolved in the manner required by law.

Although, an appellate court's finding of invited error arguably could be said to "judicially" negate the harm caused to the defendant, it would leave unremedied the harm caused to the excluded jurors and to the community. It becomes self-evident, therefore, that the invited-error doctrine would nullify the high court's very rationale for elevating the racially neutral jury right to its lofty position in the hierarchy of federal constitutional rights. Because we live in a multiracial society, deliberate racial discrimination by the government will not be condoned. (Cf. *Brown* v. *Board of Education* (1954) 347 U.S. 483 [98 L.Ed. 873, 74 S.Ct. 686, 38 A.L.R.2d 1180].)

■■■ Only one question remains. Is the Supreme Court's interpretation of the meaning of the United States Constitution binding on the state courts? The answer to this question rings loud and clear. The "Supremacy Clause" of the United States Constitution (art. VI, cl. 2) provides, "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof, . . . shall be the supreme Law of the Land; and *the Judges in every State shall be bound thereby*, any thing in the Constitution or Laws of any State to the Contrary notwithstanding." (Italics added.)

*Cooper* v. *Aaron* (1958) 358 U.S. 1 [3 L.Ed.2d 5, 78 S.Ct. 1401], explains: "This decision [*Marbury* v. *Madison*, 1 Cranch 137, 177] declared the basic

principle that the federal judiciary is supreme in the exposition of the law of the Constitution, and that principle has ever since been respected by this Court and the Country as a permanent and indispensable feature of our consitutional system. It follows that the *interpretation* of the [Constitution] enunciated by this Court . . . is [also] the supreme law of the land, and Art. VI of the Constitution makes it of binding effect on the States. . . ." (358 U.S. at p. 18 [3 L.Ed.2d at p. 17], italics added.) Therefore, "No state . . . [judge] can war against the Constitution without violating his [oath] to support it." (358 U.S. at p. 18 [3 L.Ed.2d at p. 17].)

 The dissent's reliance on *People* v. *Pride* (1992) 3 Cal.4th 195 [10 Cal.Rptr.2d 636, 833 P.2d 643], to support its invited error argument is totally misplaced. *Pride* did not involve *Wheeler-Batson* error. Rather, it involved asserted trial court error in applying an incorrect standard for evaluating the "for cause" challenges of prospective jurors on their feelings about the death penalty. We suggest this type of error, assuming it to be of constitutional significance, is at a lower step on the reversible error ladder than the "sacred and important" right to a racially neutral jury. For this reason, the error in *Pride* would probably be subject to the "harmless error" test on appeal, i.e., the reviewing court may weigh the evidence of guilt and find the error harmless "beyond a reasonable doubt." (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *Rose* v. *Clark* (1986) 478 U.S. 570, 576-579 [92 L.Ed.2d 460, 469-471, 106 S.Ct. 3101]; see also 6 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Reversible Error, § 3280, pp. 4047-4048.) Because *Wheeler-Batson* error is prejudicial *"per se"* and compels a *reversal* of the convictions (*Wheeler, supra,* 22 Cal 3d at p. 283; *Batson* v. *Kentucky, supra,* 476 U.S. at p. 100 [90 L.Ed.2d at p. 90]), *Pride* gives no support to a finding of invited error in the present case.

Finally, even in the context of invited error, the trial judge, not defense counsel, has the duty to apply the correct law. The court's duty to apply the correct law in criminal cases can only be negated in those "special situations" in which defense counsel *deliberately or expressly,* as a matter of trial tactics, caused the error. (*People* v. *Graham* (1969) 71 Cal.2d 303, 318 [78 Cal.Rptr. 217, 455 P.2d 153].) "In the absence of a clear tactical purpose, the courts and commentators eschew a finding of the 'invited error' that excuses a trial judge from [performing his duty] on material questions of law." (*Id.* at p. 319.) The test for invited error is *not* whether the appellate court can infer from the record as a whole that failure to object to the error was a deliberate tactical decision. Invited error cannot be found even if counsel's *silence* was the result of a tactical decision, since the court's duty to apply the correct law is not dependent upon counsel and is not waived by

counsel's failure to object to the error. Nor does the issue center on whether counsel subjectively desired a certain result. (*People* v. *Wickersham* (1982) 32 Cal.3d 307, 330-335 [185 Cal.Rptr. 436, 650 P.2d 311].) Error is invited only if defense counsel affirmatively causes the error and makes "clear that [he] acted for tactical reasons and not out of ignorance or mistake" or forgetfulness. (*Id.* at p. 330.)

The dissent's passionate desire to affirm the convictions in the face of clear prejudicial constitutional error must remain unsatisfied.

## LIMITED REMAND

Because of the *Wheeler* error, discussed in part 1 above, rather than reversing the judgment for a new trial outright, we believe fairness and justice will best be served if the judgment is reversed and the cause remanded to the trial court for a new *Wheeler* hearing. (See *People* v. *Gore, supra,* 18 Cal.App.4th at pp. 705-706; *Batson* v. *Kentucky, supra,* 476 U.S. at p. 100 [90 L.Ed.2d at p. 90]; *United States* v. *Tindle* (4th Cir. 1986) 808 F.2d 319, 329.) At the hearing, the court will assume the defendant has established a prima facie case of wrongful exclusion of the Hispanic and Filipino jurors, thereby placing the burden of proof on the prosecution to justify the exclusion of those jurors. (*People* v. *Fuentes, supra,* 54 Cal.3d at pp. 716-717.) The court will then make a " 'sincere and reasoned attempt to evaluate the [prosecutor's stated reasons for challenging the Hispanic Filipino jurors] . . . in light of the circumstances of the case as then known, his knowledge of trial techniques, and his observations of the manner in which the [prosecutor] has examined members of the venire and has exercised challenges for cause or peremptorily, for "we rely on the good judgment of the trial courts to distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination." ' " (*People* v. *Snow* (1987) 44 Cal.3d 216, 222 [242 Cal.Rptr. 477, 746 P.2d 452], citing *People* v. *Hall, supra,* 35 Cal.3d at pp. 167-168, quoting *Wheeler, supra,* 22 Cal.3d at p. 282; see *People* v. *Turner, supra,* 42 Cal.3d at p. 728.)

We believe the trial court should have no difficulty in recalling the circumstances of the case as they existed at the time of the *Wheeler* motion and the manner in which the prosecutor examined the other prospective jurors and exercised his peremptory and "for cause" challenges. The trial court will have available for its review the transcript of the voir dire examination of the jurors, the written questions and answers signed by the prospective jurors before voir dire, and the detailed reasons stated by the prosecutor for challenging the jurors. We have confidence that after a careful

reading of the record and this opinion, the trial court will be able to fulfill its constitutional obligation under *Wheeler, supra.*

### DISPOSITION

The judgment is reversed, and the matter is remanded with directions to conduct a new *Wheeler* hearing. If, after the hearing, the trial court denies the *Wheeler* motion, the judgment shall be reinstated after a new sentencing hearing. (*People* v. *Gore, supra,* 18 Cal.App.4th at p. 707.) If, however, the trial court grants the *Wheeler* motion, the defendant shall be given a new trial.

Martin, Acting P. J., concurred.

**BUCKLEY, J.**—I respectfully dissent. While I concur in the majority's determination the trial court applied the wrong legal standard in ruling on appellant's *Wheeler* motions, I am compelled to dissent from its holding this error mandates reversal. As I shall explain, this *precise error* was induced by defense counsel's affirmative conduct. Hence, it was invited and is not cognizable on appeal.

As quoted in detail in part 1.a. of the majority opinion, prior to the trial court's final rulings on defense counsel's second *Wheeler* motion and impaneling of the jury, the court made the following request: "I would like the standard, the legal standard which I'm to apply in order to re-evaluate this after I've read the Wheeler case but to make sure that I'm applying the right standard. So I'd like that just before—or after we break." Defense counsel replied, "I'll supply that to you." The court acknowledged this offer, "All right. Thank you." After the lunch break, the trial court asked counsel whether it had used the right standard. The prosecutor stated he "believed" the court had; defense counsel did not reply to the question and changed the subject to another topic. There is no indication in the record that defense counsel ever supplied the trial court with the correct legal standard as he had orally agreed to do.

Careful review of defense counsel's actions reveals counsel did not merely fail to object to the trial court's incorrect use of the "good cause" standard; rather, counsel affirmatively led the trial court into error. *Defense counsel explicitly and voluntarily agreed to research applicable law during the lunch break that day and provide the court with the correct legal standard to be applied and in so doing caused the trial court to rely on trial counsel's research.* The trial court verbally accepted counsel's representation he would do so. Apparently believing defense counsel had researched this issue during

the break, the trial court asked counsel that afternoon whether it had applied the "right" legal standard. The prosecutor answered in the affirmative and defense counsel did not respond on this point. In fact, rather than responding to the trial court's query, defense counsel changed the subject, stating he felt the prosecutor was wrongly reducing the importance of the role of an alternate juror. By changing the subject, counsel impliedly assured the court it had applied the correct legal standard.

By these actions, defense counsel misled the court into believing it had correctly handled the *Wheeler* motions, that it had considered the correct factors and "articulated" the right standard—the same error claimed on appeal. Thus, defense counsel affirmatively aided the court in its commission of *Wheeler* error.

It has been held the invited-error doctrine can be applied to a jury instruction claim only if defense counsel has expressly articulated a tactical basis for requesting or refusing the instruction. (*People* v. *Wickersham* (1982) 32 Cal.3d 307, 330 [185 Cal.Rptr. 436, 650 P.2d 311]; *People* v. *Bottger* (1983) 142 Cal.App.3d 974, 979-980 [191 Cal.Rptr. 408].) However, when the error occurs during jury selection rather than instruction, explicit articulation of counsel's tactical reason for the actions inviting the error claimed of on appeal is not required. In *People* v. *Pride* (1992) 3 Cal.4th 195 [10 Cal.Rptr.2d 636, 833 P.2d 643], the trial court denied defendant's challenge for cause to four prospective jurors based on their expressed views regarding imposition of the death penalty. On appeal, defendant argued the court applied the wrong legal standard by assessing the challenges under *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770] rather than *Wainwright* v. *Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844].[1] Our Supreme Court ruled that defendant is "estopped to argue that the court applied the erroneous standard or that its rulings on these four challenges for cause were incorrect." (*Pride, supra,* 3 Cal.4th at p. 228.) The court relied on the following facts: "Here, the court and counsel discussed the effect of *Witt* before jury selection began. The court opined that no California cases had yet interpreted *Witt* but that it seemed to have 'changed' *Witherspoon.* Defense counsel disagreed, arguing that *Witt* 'brought no substantial changes of any kind' to the *Witherspoon* rule. The court immediately replied that it would 'stick with the old way'—an apparent reference to *Witherspoon.*" (3 Cal.4th at p. 228.) The court concluded that "[u]nder the circumstances, any erroneous departure from *Witt, supra,* 469 U.S. 412, occurred at the request and with the approval of the defense," and, therefore, "defendant is precluded from complaining about the trial court's handling of

---

[1]*Wainwright* v. *Witt, supra,* 469 U.S. 412 had been decided about a year and a half before jury selection began in *Pride* and clarified *Witherspoon* v. *Illinois, supra,* 391 U.S. 510.

voir dire or defense challenges for cause on the issue of capital punishment." (3 Cal.4th at p. 228.)

In *People* v. *Pride, supra,* 3 Cal.4th 195, the Supreme Court made a finding of invited error based in part upon the conclusion the tactical purpose for counsel's actions was "plausible and clear." (*Id.* at p. 228.) The court declared: "Under the circumstances, any erroneous departure from *Witt, supra,* 469 U.S. 412, occurred at the request and with the approval of the defense. *The tactical purpose behind such a stance was both plausible and clear:* under *Witherspoon, supra,* 391 U.S. 510, the prosecution could excuse only those pro-life jurors who made their inability to impose the death penalty 'unmistakably clear.' " (3 Cal.4th at p. 228, italics added.) Defense counsel's tactical purpose was not explicitly articulated to the trial court. Rather, the high court inferred this purpose based upon its interpretation of the record as a whole. (Cf. *People* v. *Brown* (1962) 200 Cal.App.2d 111, 115-116 [19 Cal.Rptr. 36].)

Here, the strategic purpose behind defense counsel's actions is likewise "plausible and clear." This was a death penalty case in which the evidence against defendant was overwhelming and conviction likely. Defense counsel had great incentive to ensure a legal ground for reversal on appeal, especially as imposition of the death penalty was a distinct possibility. Even assuming defense counsel was unaware of the proper standard prior to the lunch break, in researching the applicable standard, counsel would have quickly learned the trial court had not evaluated the appropriate factors and that such error was prejudicial per se.[2] However, given this was a special circumstance case, it is presumed defense counsel was an experienced criminal trial attorney, had previously filed *Wheeler* motions and was familiar with applicable law. Counsel's silence in the face of a direct question by the trial court ensured the court would not learn of its faulty analysis, as the court was relying upon him to provide the applicable standard and the prosecutor had already stated he "believed" the court had applied the "right" standard.

By not informing the court it needed to reconsider the *Wheeler* motions by inquiring into and evaluating the genuineness of the prosecutor's reasons, and by changing the subject when asked by the court whether it had applied the correct standard, counsel could proceed to trial and press for an acquittal with the knowledge that a reversal "was in the bank" if his client was convicted.

In *People* v. *Brown, supra,* 200 Cal.App.2d 111, the appellate court upheld a magistrate's findings defendant had waived his right to a private hearing,

---

[2]In so doing, I take defense counsel at his word that he would research the applicable standard.

writing: "It also is apparent that counsel for the defendant wilfully withheld information respecting these requirements and these decisions. In the theatrical world such tactics might be classified as clever, but the courtroom is not a theatre, and the administration of justice is not a theatrical performance. The evidence before us supports an implied finding . . . that at the time the defendant made his original motion his action was not prompted by a desire to effect a private hearing, but with the hope that his request might be refused, and thus lay the foundation for a dismissal of all proceedings against him. Such conduct makes a mockery of justice." (200 Cal.App.2d at pp. 115-116.) Likewise, here, the evidence "supports an implied finding" counsel's actions reflect a conscious tactical choice, prompted by the desire to lay the foundation for reversal and that counsel's actions did not result from mere ignorance or mistake. (200 Cal.App.2d at pp. 115-116; *People* v. *Pride, supra,* 3 Cal.4th at p. 228.)

The totality of the circumstances demonstrates the trial court's erroneous application of the good-cause standard and *continued reliance on it* was "induced by [defense counsel's] own conduct. He [led the] judge into substantial error"; hence, appellant may not complain of the results of his efforts on appeal. (*People* v. *Katzman* (1968) 258 Cal.App.2d 777, 792 [66 Cal.Rptr. 319].) Therefore, it is my opinion appellant is precluded from contesting the trial court's rulings on his *Wheeler* motions. (*People* v. *Pride, supra,* 3 Cal.4th at p. 228.)

The majority argues invited error analysis is inapplicable to *Wheeler* error. On the contrary, while *Pride* is factually distinguishable from the instant situation, it establishes that the invited-error doctrine may be applied to jury selection issues, despite the constitutional significance of jury selection and the reversible per se standard applicable to such errors. Like *Wheeler* error, a finding of *Witherspoon/Witt* error also mandates retrial, although solely of the penalty phase. (*People* v. *Washington* (1969) 71 Cal.2d 1061, 1090-1091 [80 Cal.Rptr. 567, 458 P.2d 479].) Thus, our Supreme Court has not found the United States Constitution and cases such as *Batson* v. *Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] and *Witherspoon* v. *Illinois, supra,* 391 U.S. 510, to be insurmountable hurdles to application of the invited-error doctrine.[3] Since the California Supreme Court has not found the supremacy clause forecloses application of the invited-error doctrine to jury selection issues, such an analysis is not barred here.

The majority expresses concern that application of the invited-error doctrine would leave unredressed the harm caused to the excluded jurors and the

---

[3]Contrary to the majority's opinion, when one is facing the death penalty, one no doubt finds the prospective jurors' "feelings about the death penalty" (maj. opn., *ante,* at p. 1030) to be at least equally as important as their race.

public by the impermissible exclusion of minority jurors, relying on *Batson v. Kentucky, supra,* 476 U.S. 79. It is true *Batson* declared that "Racial discrimination in selection of jurors harms not only the accused whose life or liberty they are summoned to try," but injures the excluded jurors and the entire community as well. (*Id.* at p. 87 [90 L.Ed.2d at p. 81].) However, the majority fails to acknowledge the fundamental distinction between *Batson* and the instant case. Here, the record before this court is completely devoid of any evidence demonstrating the prosecutor exercised his peremptory challenges in a racially biased manner. Rather, what is before this court is a classic "legal technicality." Defendant's charges of racial bias in exclusion of jurors were explored at length. Because the trial court failed to enunciate the "magic words," reversal and remand is mandated. Yet, this court cannot lose sight of the fact that the *Wheeler* hearings (botched as they were) failed to reveal any significant evidence demonstrating the alleged bias. In fact, the defense excused more Hispanic jurors than did the prosecution and two jurors with Hispanic surnames were ultimately part of the jury as impaneled. Unlike cases such as *People v. Hall* (1983) 35 Cal.3d 161 [197 Cal.Rptr. 71, 672 P.2d 854] and others in which there was clear evidence the prosecutor was acting improperly and thus injuring our entire system of justice and the community, there is no such evidence here. Based on a thorough review of the transcript of the voir dire, the *Wheeler* hearings and the jury question-naires, it can confidently be determined the prosecutor was not improperly excluding minorities. Hence, the trial court's failure to articulate the right standard resulted in no harm to defendant, the excluded jurors or the public. Therefore, the concerns raised in *Batson* are not implicated here.

For the many reasons enunciated above, I conclude application of the invited-error doctrine is not precluded in jury selection issues.

I am aware that had the majority adopted my view, appellant may well have filed a petition for habeas corpus arguing defense counsel did not make a tactical decision to renege on its promise to the court but rather acted out of ignorance and was therefore "ineffective." However, even assuming the veracity of such an allegation if made, the record does not support a finding appellant suffered any prejudice as a result of defense counsel's conduct. Appellant did not express dissatisfaction with the jury as impaneled and it cannot be demonstrated prospective jurors Gustavo, Rodriguez or Raping would have voted differently than did the jurors who rendered the verdicts against him. (See, e.g., *People v. Caro* (1988) 46 Cal.3d 1035, 1047 [251 Cal.Rptr. 757, 761 P.2d 680].) In addition, as was briefly discussed in part 2 of the majority opinion, the evidence against defendant was overwhelming and the defense implausible, at best. *No reasonable jury, no matter how*

*constituted, could have believed his story.* Thus, in my opinion, had the majority held defense counsel invited the *Wheeler* error and affirmed the judgment, a subsequent attempt to obtain reversal based on a claim of ineffective assistance of counsel would have failed.

I concur in the majority opinion in all other respects.

A petition for a rehearing was denied June 29, 1994, and the petitions of both respondent and appellant for review by the Supreme Court were denied September 8, 1994. Mosk, J., and George, J., were of the opinion that the petitions should be granted.