Filed 9/2/14  P. v. Bishop CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CHARLES BISHOP,<br><br>Defendant and Appellant. | F065917<br><br>(Super. Ct. No. 06CRSP678175)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Arlan L. Harrell, Judge.

Michael B. McPartland, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Jeffrey A. White, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

On or about December 19, 2006, the Fresno County District Attorney filed a petition to reextend appellant Charles Bishop's commitment to a state mental hospital as a sexually violent predator (SVP), pursuant to the provisions of the Sexually Violent Predators Act (SVPA; Welf. & Inst. Code, § 6600 et seq.).[1] On September 25, 2012, after numerous continuances and two probable cause hearings, a jury found the allegations of the petition to be true. That same day, the trial court ordered that appellant be committed to the Department of State Hospitals (DSH) pursuant to section 6604.

Appellant now contends the trial court committed prejudicial instructional error by refusing to supplement (1) the definition of "a diagnosed mental disorder" with a statement explaining that for a person to suffer from such a mental disorder, he or she must have serious difficulty controlling his or her dangerous behavior, and (2) the legal definition of "likely" with a statement explaining the term means much more than a mere possibility. We reject these claims and affirm.

## TRIAL EVIDENCE

The parties stipulated that on July 17, 1984, and May 29, 1991, appellant was convicted of violating Penal Code section 288, subdivision (a), which proscribes commission of lewd or lascivious acts on a child under the age of 14. He received "a fixed sentence" as a result of each conviction.

*Dr. Kathleen Longwell*

Dr. Kathleen Longwell, a licensed psychologist, had extensive experience and expertise in the evaluation of SVP's.[2] She explained that three questions must be answered in order to determine whether an individual meets the criteria for being an SVP.

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise stated.

[2] Longwell was called as a witness by the People.

2.

The first is whether the individual was convicted of a qualifying predicate offense.[3] The second is whether the individual has a diagnosed mental disorder that predisposes him or her to the commission of future sexually violent offenses. Longwell explained that the statutory definition of a diagnosed mental disorder — a congenital (present at birth) or acquired (acquired after birth) mental disorder that predisposes the person to the commission of future sexually violent offenses by impairing his or her emotional and volitional control — is different from the definition of a mental disorder contained in the Diagnostic and Statistical Manual (DSM), which says nothing about emotional or volitional impairment. Thus, an individual might have a number of different diagnosed mental disorders, but any that do not predispose him or her to the commission of future sexually violent offenses by impairing his or her emotional and volitional control, do not constitute qualifying diagnoses. The third question is whether, based on the diagnosed mental disorder, the individual is considered likely to commit a sexually violent and predatory offense in the future without treatment in custody.

As part of her evaluation of appellant, Longwell reviewed documents submitted to her by DSH, including hospital and mental health records, and records concerning appellant's criminal cases. In addition, she interviewed appellant for two hours and 45 minutes on June 24, 2011, and spoke to him by telephone on another occasion. At the conclusion of her evaluation, Longwell determined appellant met the criteria for being an SVP.

Longwell diagnosed appellant with pedophilia, sexually attracted to females, nonexclusive type. This diagnosis involves sexual attraction to prepubescent children — manifested in the individual's having sexual fantasies, urges, or actual behaviors with prepubescent children — exhibited for at least six months; the attraction causing the person either significant clinical distress or impairment in his or her life functioning; and

---

[3] Appellant's convictions satisfied this criterion.

3.

the person being at least 16 years of age, with the object of his or her attraction being at least five years younger.

In reaching this diagnosis, Longwell considered the behavior that resulted in appellant's convictions. In his interview with Longwell, appellant related that, in 1984, he was at the house of someone he knew where some children were playing. Appellant told a six-year-old girl to go into the garage with him. Once inside, he lifted up her dress, pulled down her underpants, and touched and licked her genital area. Appellant further related that the little girl was riding her bicycle and wanted to give him a ride. She went over a bump; he thought she hurt her vaginal area and he should look at it to see if she was okay. When he suggested to her that he should look at it, she pulled up her dress and pulled down her underpants. Appellant said he may have touched her on the "clit," and that he had an urge to look at and touch her. Appellant said he did not recall things very well because he had been using hallucinogenics and methamphetamine for several days and was hallucinating.

In 1989, appellant was doing poorly and living in filth, and was showering in the locker room of a public swimming pool. While at the swimming pool, he cornered a nine-year-old girl by holding onto her arm and forcing her against the wall. He then fondled her vaginal area over her bathing suit. He also said he was twirling the little girl around in the pool and had his hand on her buttocks. She let go, and his hand deliberately touched her crotch over her swimming suit. Appellant told Longwell he had been using rock cocaine and methamphetamine for the prior three months and was having visual hallucinations.

Longwell found these incidents relevant because appellant engaged in behaviors involving two prepubescent girls over a considerable period of time. Appellant admitted having urges to do what he did to those girls, both of whom were strangers. Having been punished for the first incident, appellant was aware it was a serious crime and hurtful to children, yet he did it again. Appellant was unable to control his sexual urges.

4.

Longwell also diagnosed appellant with exhibitionism. Exhibitionism is the urge to exposing one's genitals to other people, particularly strangers, and acting on that urge. In 1998, appellant exposed himself to a grown woman and her four-year-old daughter or niece. Appellant told Longwell he was merely going to the bathroom outside when the woman saw him. Longwell's diagnosis of exhibitionism was based on that incident, as well as the fact that, while at the state hospital, appellant had been written up a number of times for exposing himself to female staff and masturbating in front of them in what was described as a deliberate way.[4] Appellant had been admonished not to do that, but persisted in his behavior, with the last incident reported in 2007.

Longwell also diagnosed appellant with schizoaffective disorder, depressed type. Longwell explained this is a form of schizophrenia, albeit milder than full-blown schizophrenia. A schizoaffective person may have visual or auditory hallucinations, or delusions and paranoia with a significant emotional component. The person might be either depressed or manic, or a combination of the two. Appellant's records indicated a long history of his reporting to have heard voices, to have seen visual hallucinations, and of being paranoid, not only when he was involved with substance abuse, but dating back to early childhood. Appellant had a long history of being hospitalized for a psychotic disorder, being found incompetent to stand trial, and having suicide attempts and suicidal ideation. Appellant, however, told Longwell he had never had hallucinations when he was not using drugs. He claimed to have the symptom on a number of occasions so as to avoid prosecution for something, or to obtain disability benefits, or for some other secondary gain.

Longwell diagnosed appellant with personality disorder, not otherwise specified (NOS), with borderline passive-aggressive and antisocial traits. Longwell explained a personality disorder is a character disorder. It is considered a dysfunctional or

---

[4] Staff members said appellant would masturbate and wave at them.

maladaptive way of relating to the world. Appellant did not do well with other people and did not function well in life. He even said he could not participate in treatment because he lacked empathy. He said he did not have a good sense of right or wrong with respect to hurting other people, but "sort of just thinks about what he wants at the moment."

Longwell diagnosed appellant with polysubstance dependence in institutionalized remission. Polysubstance abuse means the person has a drug dependency involving multiple drugs to the extent the drug abuse has a serious negative impact on his or her life or the lives of others. According to appellant, he started using illicit drugs when he was a child, and he attributed his first two sex offenses to being under the influence of drugs.

In Longwell's opinion, the combination of appellant's mental problems impaired his emotional and volitional controls and predisposed him to the commission of future sexually violent offenses. Even if the schizoaffective disorder were omitted because, for example, appellant was telling the truth about never having hallucinations except while using drugs, Longwell would still conclude he was a serious and well-founded risk to reoffend because of the diagnosis of pedophilia. Appellant had a long history of irresistible sexual urges toward prepubescent children. Urges he had acted on. The other diagnoses were "fuel to the fire that already exist[ed]." Appellant had not controlled his urges when he was in the community; moreover, it was not the drugs that made him molest children. Most people who use drugs do not molest children. The drugs did, however, further impair appellant's controls, or whatever controls he might be trying to exercise.

In coming to her conclusion, Longwell relied in part on appellant's scores on four actuarial instruments. His scores placed him in the moderately high to high risk categories. Because those instruments did not have anywhere near 100 percent predictive accuracy and merely gave group averages, however, Longwell felt it important to also "take a really good look at the individual" being evaluated. Longwell took into

6.

consideration appellant's age and health.[5] She spoke to appellant about his plans if he were released; appellant said he thought he would be able to get on social security and disability for a mental disorder and he had family and friends he thought would help him out. Appellant also said he had written books and was involved in two lawsuits he hoped would make some money available to him.

Longwell concluded appellant had a well-diagnosed mental disorder that affected his volitional control. Appellant was likely — a serious and well-founded risk — to reoffend.

*Dr. Wesley Maram*

Dr. Wesley Maram, a clinical and forensic psychologist, had extensive experience and expertise in the evaluation of SVP's.[6] Maram interviewed appellant on February 1, 2012, for two and a half hours. Maram diagnosed appellant with pedophilia, schizoaffective disorder, and polysubstance dependence.

Maram explained that pedophilia is a condition of intense recurrent sexually arousing fantasies, urges, or behaviors toward prepubescent-aged children. Someone can molest a child without being a pedophile; a transient interest acted out on a single occasion does not make a person a pedophile. The appellant's condition, however, was not transient. He had a history of sexual offenses toward prepubescent-aged girls in 1984 and 1989, and self-reports of uncontrollable urges to touch little girls. When Maram asked appellant about the 1984 incident, appellant said that the girl had injured herself on her bicycle and appellant was inspecting her vaginal area and somehow his tongue touched that area. With respect to the 1989 incident, appellant said the victim came up to him and put her arms around him, and his hand was on her "butt" and he rubbed her. He

---

[5] Appellant's age — 53 — reduced his risk of future sex offending, although that factor was already calculated into two of the actuarial instruments Longwell used.

[6] Maram was called as a witness by the People.

said he did not plan to do this; he was overdosed with drugs and looked to the sky and said, "God, there is nothing you can do."  Maram did not know if, in fact, appellant was using drugs; appellant told someone in 1990 that he had used cocaine two weeks before the 1989 incident but was not using drugs at the time.  Because the earlier reports would be more reliable than reports years later, Maram suspected appellant was not using drugs.

Maram noted that, in 1990, appellant told a psychiatrist, "I lust after little girls in my imagination.  I don't know why I am a pedophile."  Appellant reported to Maram that he did not have sexual fantasies concerning children.  In Maram's view, there was no sexual behavior since the arrest in 1989 that demonstrated pedophilia.  However, while the rates of reoffense for people with sexual crimes against children decrease steadily with age, Maram knew of no evidence pedophilia goes away.  Moreover, appellant had been incarcerated or in a hospital since 1999, and so had not been around children.

Maram explained that schizoaffective disorder is a combination of two disturbances — schizophrenia, which is a break in reality, where a person has hallucinations and delusions; and a mood disturbance, where the person may predominantly have mood swings of depression or mania.  Appellant had a self-reported history of hearing voices as early as age seven.  He had delusions relative to religiosity.  During Maram's interview, appellant showed signs of hypermania with racing thoughts and pressured speech.  Although his records showed he sometimes exaggerated his symptoms to manipulate the system, reports from other evaluators throughout appellant's history — including appellant's family — consistently showed he was mentally disturbed.

Maram explained polysubstance dependence.  It is the use of three or more substances during the same time period, with no preference for any single one.  Dependence means the individual has developed a tolerance for the drugs.  The drug abuse interferes with the person's life in multiple areas.  Often, the person knows taking

the drugs is harmful physically and psychologically, but he or she does not stop, or has difficulty stopping.

In order to determine whether someone is likely to reoffend in a sexually violent predatory manner, Maram considers both group data (the risk rate of a group of people who best match the individual and his risk factors) and the person as an individual. In appellant's case, Maram used two actuarial instruments. On both, appellant scored in the moderately high risk range. Because of appellant's long history of unpredictable behavior, confused thoughts, sexually compulsive behaviors, aggressiveness, and making all sorts of sexual allegations about staff at the hospital,[7] Maram concluded the group data understated the seriousness of the risk of appellant's "offense behavior."

In appellant's case, it was not merely the pedophilia disorder that led Maram to conclude appellant was likely to reoffend in a sexually violent predatory manner. Appellant had strong sexual urges toward children, but also had bizarre thinking and hallucinations. His behavior was unpredictable. His history of substance dependency and the use of all sorts of drugs lowered his inhibitions. Appellant also had a history of brain injury with resulting brain damage from falling off a horse when he was young. Thus, Maram's conclusion was based on a combination of factors.

Maram took appellant's physical health into consideration. Despite recent, successful surgery to correct a serious heart problem, appellant was not physically

---

**7**      For instance, appellant told Maram that within the month preceding their interview, somebody sexually abused him four times. In addition, appellant's records reflected that, while at Atascadero, appellant accused nurses of exposing themselves sexually to him, when he was repeatedly exposing himself to them and admitted he had difficulty not exposing himself to the nurses.

     Appellant was extremely sexually active from a very young age. He was sexually involved at around age seven with two young girls. He was "anally raped" twice at the age of 10 by an older teenage boy. He had "nearly daily" sex with his friend's sister at age 11. In sum, appellant was a highly sexualized child.

healthy. Although this reduced appellant's risk, Maram still found him likely to reoffend. Maram also had information that, while at Atascadero State Hospital, appellant was taking Lupron, an antiandrogen commonly referred to as chemical castration. In 1999, appellant requested medication to decrease what he called "lustful thoughts," a term he used in 1990 in reference to pedophilia. Despite the medication, he was very active in terms of fantasies about exposing himself to nurses. Once he went to Coalinga State Hospital, he no longer received Lupron, possibly because he refused the drug.[8]

During their interview, Maram asked about appellant's future plans. Appellant said he planned to live with a cousin, try to get Social Security, maybe get a job, and keep away from trouble. He also said he had authored 20 books on uniting the world religions, and that he had a publisher.

Taking everything into account, Maram concluded appellant had a diagnosed mental disorder that affected his volitional capacity. Based upon that diagnosed mental disorder, appellant had a substantial serious and well-founded risk of reoffending in a sexually violent predatory manner.

_Dr. Carolyn Murphy_

Dr. Carolyn Murphy, a psychologist, had extensive experience and expertise with SVP screenings and evaluations.[9] She conducted an initial evaluation of appellant, including an interview with him, in May 2011. Although appellant arrived in a wheelchair, Murphy did not note any glaring concerns as far as his physical state.

Murphy and appellant discussed the 1984 offense. Appellant admitted putting his mouth on the genitals of the victim and touching her under her panties to fondle her. He said he had been using LSD or a hallucinogen before the incident, offered the victim a ride on a bicycle, they ended up in a shed, and he touched her. He said he felt "awful"

---

[8] Maram had never known a case in which the drug was administered involuntarily.

[9] Murphy was called as a witness by the People.

about what he had done.  With respect to the 1991 incident at the pool, appellant said he had been using drugs for several days.  He also indicated some psychosis, perhaps hallucinations or disorganized thinking.  He had been going to the pool to clean himself off.  Somehow, a girl ended up with her arms wrapped around him and he touched her. Murphy also discussed with appellant the incident in 1998, which took place outside a church.  Appellant related he had been urinating outside an office, and when he saw an adult female looking at him, he began to masturbate.  He said she was smiling at him. Appellant asserted that it was not his intent to expose himself to any children.

In June 2012, Murphy performed an updated evaluation.  Appellant declined to be interviewed.  Appellant's records showed he had heart surgery the previous summer. There were also some behavioral issues that may have been secondary to the discontinuation of some psychotropic medications.  For instance, in December 2011 and January 2012, appellant had fluctuating moods.  He was described as being irritable and labile.  He was observed to curse at staff and yell.  He alleged a male peer sexually assaulted him, and then alleged a staff member also did so.  Because Murphy had no access to any internal investigation by the hospital, she did not know if these things actually happened.

Murphy ruled out exhibitionism in her diagnosis because there was only one incident.  For most disorders, there must be at least a six-month pattern of conduct, or the person must report being distressed by urges or fantasies for a significant period of time.

Murphy diagnosed appellant with:  pedophilia, sexually attracted to females, nonexclusive type (meaning appellant also had sexual relationships with adult females); schizoaffective disorder, depressive type; unknown substance abuse; and personality disorder, NOS, with borderline antisocial traits.

11.

Murphy explained that pedophilia never "goes away." The behavior can be controlled, but the underlying condition is considered chronic even if, due for instance to treatment or aging, the activity diminishes over a period of time.[10] Murphy's diagnosis was not altered by appellant having not offended sexually against children since 1991 since appellant had not had access to children.

Murphy concluded appellant had a diagnosed mental disorder that affected his volitional capacity. She further concluded he was likely to reoffend in a sexually violent predatory manner. In reaching this conclusion, she relied in part on two actuarial instruments. On each, appellant placed in the moderate to high risk category.[11] Murphy also took into consideration "protective factors," such as age or a medical condition that might either shorten the person's time to reoffend or significantly interfere with his or her ability or motivation. In appellant's case, neither his age nor his medical condition suggested there was imminent risk of his passing away, and neither would necessarily interfere with the ability to offend, particularly against young children.

In determining whether someone was a serious and well-founded risk of reoffense, Murphy did not look at the person in a vacuum. The primary diagnosis was pedophilia. Substance abuse and thought disorder were additional diagnoses that could enhance the

---

[10] Murphy explained that criminal conduct in general tends to decrease starting at around age 40. For sex offenders, the decrease starts at an older age, perhaps 50. Although the rate of reoffense for pedophiles necessarily declines with age due to a number of factors such as decreased libido, erectile problems, medical issues, and obesity, it does not necessarily show the same decrease. Behavior fluctuates, but the underlying drive — the need or deviant interest — does not.

[11] Murphy explained that actuarial instruments do not say what the risk is for an individual. Rather, the actuarial instruments are based on group norms, and work by comparing appellant to some group of offenders with known outcomes regarding recidivism. Murphy agreed with the notion that an individual's risk cannot be established by looking at the overall risk for an entire group. In her opinion, however, clinical judgment has a 50 percent chance of being accurate. Using the actuarial instruments increases it to a 70 percent chance.

12.

risk of reoffense because they were dynamic — they might have a significant or no impact. Substance abuse issues increase the risk because they are disinhibiting or can affect reality testing and judgment. A mood disorder that is not well controlled or treated with medication can also increase the risk.[12] In addition, a cognitive and neuropsychological assessment was performed on appellant in 2010, and he was determined to have mild cognitive impairment. Appellant's cognitive impairment included memory problems. Memory problems can be relevant to a person's ability to control his or her sexual behavior; if the individual has been taught coping strategies but cannot access them, particularly in times of heightened emotional or sexual arousal, his or her impulse control is affected.

Based on Murphy's evaluation of appellant, she concluded he had a diagnosed mental disorder that affected his volitional capacity. Because of that diagnosed mental disorder, he was a substantial, serious, and well-founded risk to reoffend in a sexually violent predatory manner.

*Dr. Lee Coleman*

Dr. Lee Coleman was a medical doctor with a specialty in psychiatry, although he had not taken the specialty board examinations.[13] He had been semi-retired for about five years, although he continued to accept some legal cases. His experience testifying in court as a psychiatric expert generally involved the areas of legal insanity, diminished capacity, and competency. He had also reviewed 40 to 50 cases in which the person was alleged to be an SVP, and had testified in 75 percent or more of those cases.

---

**12**     Murphy acknowledged the scientific community has no established means of testing a person's ability to control him- or herself. She formed her opinion based on patterns of conduct linked to the mental disorder.

**13**     Coleman was called as a witness by appellant.

13.

Coleman evaluated appellant by reading the material provided by defense counsel, including the record of appellant's past criminal behavior, his institutional adjustment, and his prior evaluations. He also interviewed appellant twice. In his opinion, the People's experts simply considered whether appellant met the requirements for some mental disorder as stated in the DSM. However, a DSM mental disorder says nothing about whether a person "meets the *legal* requirements for a mental disorder." The law requires a mental disorder that interferes with a person's ability to control him- or herself. The psychiatric community has regularly admitted it cannot determine whether someone acted out of choice or because of a mental disorder. In Coleman's opinion, the People's experts put forth no method — scientific or otherwise — in their reports for determining appellant had a mental disorder that caused some interference with his self-control. They simply picked diagnostic categories from the DSM and concluded those disorders caused appellant to have a control problem.

According to Coleman, appellant's prior sex offending did not establish he had a "legally defined mental disorder," because there is no method for determining the presence of a disorder that interferes with one's ability to control his or her behavior. There is no evidence such a disorder exists, or that a psychiatrist could determine it if there was. Because appellant covered so much ground in his statements and so often contradicted himself, his statements could not be used as a basis for any kind of conclusion.

Coleman saw nothing to establish schizoaffective disorder. Schizoaffective disorder is a disorder in which the individual has two major disorders at the same time. One is schizophrenia, a psychotic disorder. Such a person is "out of touch with reality in a very global way," meaning he or she cannot communicate anything that is rational and has bizarre thinking, i.e., delusions. In Coleman's review of the records, he never found any observational material he would normally expect to see of someone who was schizophrenic. Coleman saw no evidence appellant had ever been psychotic.

14.

For commitment under the SVPA, the law requires that, as a result of a mental disorder and its interference with the person's ability to conform, the person is a present danger to the community if not in a confined setting. Coleman did not believe the People's experts established appellant posed the required level of danger as a consequence of a legally defined mental disorder, because (1) they failed to demonstrate the legally required mental disorder, and (2) the methods available for predicting future risk are experimental and do not have a reliable scientific basis. The actuarial instruments used in these kinds of cases are not accepted for use in the scientific community to assess future reoffending; the only people who accept them are the small subset of professionals who use them. According to Coleman, there is no method accepted in the general scientific community for assessing a person's likelihood of future reoffending. There are generally accepted risk factors for populations, but not for individuals.

In his interviews with appellant, Coleman asked for appellant's version of the offenses for which he was convicted. Coleman did not, however, feel his versions were helpful and did not put any weight on them, because his purpose was not an SVP evaluation.

Coleman had never found anybody to meet the criteria under the SVP law, but he had never found anybody not to meet the criteria, either. He did not give an opinion whether a person qualified, because he did not believe the tools exist in his profession to allow those in the profession to assist lay people.[14] The other experts gave their opinions; the question for the jurors was how much weight to give any opinion, including Coleman's opinion. Coleman's opinion was that the other opinions did not deserve any

---

[14] In Coleman's opinion, there is nothing in the training of a psychiatrist that makes him or her better than anyone else at studying someone's past behavior and drawing a conclusion with regard to the particular issue involved.

weight.  Coleman believed there should not be any type of involuntary commitment for mentally ill people, no matter how psychotic the person.

*Dr. Theodore Donaldson*

Dr. Theodore Donaldson, a licensed psychologist, had extensive experience and expertise in SVP cases.[15]  He was "very involved in the prediction issues" and always testified for the defense.

Donaldson explained that the correlation between prediction and recidivism is very low.  In addition, the SVPA requirement of serious difficulty controlling sexually dangerous behavior is "a statutory construct," with no science to address it.  The concept of a "legally defined mental disorder" does not exist in scientific literature.  None of the diagnostic categories predisposes a person to any specific behavior.  Even when there are behaviors associated with a disorder, predisposing issues are not understood.  Because there is no science that tells anything about a person's ability to control behavior, there is no way to determine whether a person lacks ability to control behavior as required under the legal definition of a mental disorder.

Donaldson read the evaluations of the other experts, appellant's hospital records, and appellant's prison files.  He also interviewed appellant.  Donaldson believed there was insufficient evidence to support the conclusion appellant met the "legal requirements for a mental disorder."  In his opinion, there were no specific criteria for how pedophilia is diagnosed.  For him to diagnose pedophilia, he would require a preference for children as the objects of arousal.  Donaldson was not certain whether even a true preference for children was enough to identify pedophilia.  There was no evidence appellant had a preference for sexual activity with children; he had only two instances of sexual assault of children, and there was a question whether these incidents were an expression of some psychopathology or drugs.  There was no indication appellant was actually aroused at the

---

[15]     Donaldson was called as a witness by appellant.

16.

time of either, had an erection, or masturbated afterwards. Appellant had had no behavioral manifestations of pedophilia since the 1984 and 1989 offenses. Although appellant sometimes made statements that were interpreted as him having fantasies about children, most of the time appellant said he did not have any sexual arousal to children, and he had never been known to seek out suggestive pictures of children. Pedophilia could not be assumed from the fact of prior sex crimes, because no amount of criminality identifies a mental illness.

In Donaldson's opinion, the People's experts did not establish appellant had the required difficulty controlling his behavior as a consequence of a mental disorder. It would be very hard to do, because nothing is really known about ability to control behavior.

With respect to the third SVPA criterion — the person is likely to commit sexually violent offenses in the future as a result of his or her diagnosed mental disorder — Donaldson explained that the traditional approach in making such a determination is to use some sort of risk estimation. However, there has never been a study allowing the evaluator to link the diagnosable mental disorder to the risk. Moreover, the actuarial instruments may give a somewhat accurate group estimate, but what is needed in court is an accurate estimate for the particular individual, something that is very different. Because the instruments are so inaccurate, low scores do not prove a person has a low risk, and high scores do not prove a person has a high risk. Clinical judgment does not help; trained clinicians do not do any better than lay people. The actuarials do better than clinical assessment. Combining the risk instruments with clinical judgment makes the accuracy of predictions with regard to future behavior even worse.

*Appellant*

Appellant testified he was convicted in 1984 for an incident that occurred a little over two and a half years earlier, when he was around 22 years old.[16] He was standing in the front yard, "blasted out of [his] head" on what he thought was LSD but "turned out to be Lord knows what." A six-year-old girl rode her bicycle up to him and asked if he wanted a ride. It was a stingray-type bicycle, with a banana seat. Appellant got on the back, and the girl rode around a big garage and then around the corner. They hit a hole and then a bump, then she rode into a garage area and stopped. Because she screamed a bit when she hit the bump, appellant, who was paranoid, panicked and asked her if she was hurt "down there." When she said yes, he asked if he could see it, because he wanted to see if she was bleeding. When she pulled up her dress, he pulled her panties forward. He fell forward because he was passing out, and he came to with his face "down there." He admitted touching his tongue to the outer part of "her clit."

Appellant admitted telling the investigating officer some evil force made him do it, but explained that he lied until the year 2000 about being mentally ill. Since that time, he had been trying to "come clean" to the doctors. He lied because he was molested as a boy and did not want to be raped in prison, and when he went into the criminal system in 1984, he learned how to "play the game" in order to be found innocent based on a bogus diagnosis of schizophrenia. When he tried to "come clean," however, "they" would not let him. He asked for testing on several occasions, but his requests were denied. At first, he was allowed to go without medication, but then a sergeant assaulted him without provocation and gave him a brain aneurysm. This occurred while appellant was in the hospital at the California Men's Colony, perhaps around 2002. After that, he was forcibly medicated. "They" wanted to use appellant's psychiatric condition against him so the sergeant would not be prosecuted for attacking appellant. Appellant denied faking

---

[16] Appellant was called as a witness by both parties.

18.

mental symptoms prior to 1984.  Although he admitted saying he heard voices when he was seven years old, in reality he never heard voices in his life.  He lied about things while in Atascadero to get what he wanted.  It was "part of the game" everyone was playing.

With respect to the incident in the swimming pool, which occurred when appellant was approximately 30 years old, appellant explained he "committed a heinous act on a little girl because [he] was all doped up for three months."[17]  He did not believe it would have happened had he not been on drugs.  Appellant denied cornering the girl; as she spun her torso around, his finger touched her on the crotch area.  It started out as an accidental touching, but did not end up that way.  However, there was no sexual lust or fantasy in appellant's thoughts.  He touched the girl one time (not twice, like she apparently reported to the police) and she swam away.

The incident at the church took place in 1998.  Appellant explained that he was leaving church and urinating outside.  A woman, who was his age, saw him.  Appellant wrongly got the impression she was watching him, and he did not cover himself fast enough.  He admitting he was masturbating, though he did not do so knowingly in the presence of the little girl who was with the woman.  He was unaware at the time a child was present.  He was a little upset at the church; he had thought some people there would be different in how they dealt with a person like him who was a sex offender.

Asked if he considered himself a sex offender, appellant explained he was perceived as a sex offender and had offended sexually.  Because he believed the molestations would not have happened had he not been under the influence of drugs, he felt that as long as he left narcotics alone, as he had been doing (even going so far as to

---

**17**     Appellant testified he quit taking drugs after the incident with the girl on the bicycle, but relapsed in 1989 for three months and reoffended.  Since then, he had not had any drugs.

19.

refuse pain medication he needed), and took other precautions (such as not setting himself up to give the wrong appearance, as by "hanging out" at a park or public swimming pool), he would not offend if he was out on the street. He would have an apartment and would be trying to make money by writing books.[18] With his medical conditions, he would also be able to access his Social Security benefits. He also had family members who would help him some, and he would access whatever programs were available in Fresno.

## DISCUSSION

The SVPA defines an SVP as "a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (§ 6600, subd. (a)(1).) "[L]ikely" in this context means the person presents "a substantial danger, that is, a serious and well-founded risk, of committing such crimes if released from custody." (*People v. Roberge* (2003) 29 Cal.4th 979, 988, italics omitted.) A diagnosed mental disorder "includes a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." (§ 6600, subd. (c).) A finding the person is dangerously disordered is not enough; there must also be "a volitional impairment rendering [the person] dangerous beyond [his or her] control." (*Kansas v. Hendricks* (1997) 521 U.S. 346, 358; see *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1157-1158.) In other words, there must be proof the person has "serious difficulty

---

**18** Appellant related that he had material for several books, and had one ready to be put together and self-published. The book was about life, where it comes from, and people's concepts of God. One chapter concerned uniting all the religions of the world. Appellant explained he did not necessarily believe all these things; he was "in it for the money."

in controlling" his or her dangerous behavior. (*Kansas v. Crane* (2002) 534 U.S. 407, 413; accord, *People v. Williams* (2003) 31 Cal.4th 757, 759 (*Williams*).)

Pursuant to CALCRIM No. 3454, the trial court twice instructed the jury, in pertinent part:

> "The petition allegations [*sic*] that Charles Bishop is a sexually violent predator.

> "To prove this allegation, the Petitioner must prove beyond a reasonable doubt that:

> "One, he has been convicted of committing sexually violent offenses against one or more victims;

> "Two, he has a diagnosed mental disorder;

> "And three, as a result of that diagnosed mental disorder, he is a danger to the health and safety of others because it is likely that he will engage in sexually violent predatory criminal behavior.

> "The term 'diagnosed mental disorder' includes conditions either existing at birth or acquired after birth that affect a person's ability to control emotions and behavior and predispose that person to commit criminal sexual acts to an extent that makes him or her a menace to the health and safety of others.

> "A person is likely to engage in sexually violent predatory criminal behavior if there is a substantial, serious, and well-founded risk that the person will engage in such conduct if released into the community.

> "The likelihood that the person will engage in such conduct does not have to be greater than 50 percent."

Appellant does not claim the trial court erred in giving CALCRIM No. 3454.[19]

Rather, he contends the trial court prejudicially erred by refusing to instruct the jury with

_____

[19] The People were seeking to extend appellant's already-existing commitment as an SVP. At the time of appellant's trial, the bench notes for CALCRIM No. 3454 advised (as they do now) that CALCRIM No. 3454A, not CALCRIM No. 3454, should be used for extension or status proceedings. (Bench Notes to CALCRIM No. 3454 (2012) p. 1051.) An SVP extension hearing is not a mere review or continuation of an earlier

appellant's requested supplemental definitions of "a diagnosed mental disorder" and "likely."

"SVP trials are '"special proceedings of a civil nature,"' wholly unrelated to any criminal case. [Citation.]" (*Moore v. Superior Court* (2010) 50 Cal.4th 802, 815.) Because civil commitment involves a significant deprivation of liberty, however, a defendant in an SVP proceeding is entitled to certain due process protections, albeit not the entire range of criminal procedural protections. (*Id*. at pp. 818-819; *People v. Carroll, supra,* 158 Cal.App.4th at p. 511.) We need not determine whether penal or civil statutes relating to jury instructions control; under either, any party may ask the trial court to give the jury special instructions concerning points of law. (Code Civ. Proc., § 609; Pen. Code, §§ 1093, subd. (f), 1127.) Likewise, we need not decide whether appellant's requested instructions constituted mere amplifications or clarifications (see, e.g., *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1192) or true pinpoint instructions, i.e., instructions pinpointing the theory of the defense case (see, e.g., *People v. Bolden* (2002) 29 Cal.4th 515, 558; *People v. Wright* (1988) 45 Cal.3d 1126, 1137). A trial court may refuse any proffered instruction if it incorrectly states the law, is argumentative, or merely duplicates other instructions. (*People v. Bolden*, *supra*, at p. 558; *People v. Gurule* (2002) 28 Cal.4th 557, 659; *Ideal Heating Corp. v. Royal Indem. Co.* (1951) 107 Cal.App.2d 662, 668.)

During in limine motions, appellant asked the trial court to add to the definition of "diagnosed mental disorder" contained in CALCRIM No. 3454, the requirement that "the

---

proceeding, but instead is a new and independent proceeding at which, with limited exceptions, the petitioner must prove the individual meets the criteria of the SVPA. (*People v. Munoz* (2005) 129 Cal.App.4th 421, 429.) Since an SVP extension proceeding essentially requires that SVP status be determined anew (*People v. Carroll* (2007) 158 Cal.App.4th 503, 509), we see no problem with the trial court's having given CALCRIM No. 3454 instead of CALCRIM No. 3454A.

22.

diagnosed mental disorder has to cause serious difficulty controlling dangerous sexual behavior." After argument, the court found no need to amplify the language of the standard instruction. The trial court confirmed, during the jury instruction conference, that it would give CALCRIM No. 3454 as written. We conclude the trial court did not err in refusing the requested modification.

In *Williams*, *supra*, 31 Cal.4th 757, the California Supreme Court acknowledged that the SVPA does not use the precise language of *Kansas v. Crane*, *supra*, 534 U.S. at page 413, which prohibits involuntary confinement of persons on the basis they are dangerously disordered "without 'proof [that they have] serious difficulty in controlling [their dangerous] behavior.' [Citation.]" (*Williams*, *supra*, at p. 759.) The state high court concluded, however, that, read together, the language of section 6600, subdivisions (a)(1) and (c) "inherently encompasses and conveys to a fact finder the requirement of a mental disorder that causes serious difficulty in controlling one's criminal sexual behavior." (*Williams*, *supra*, at p. 759.) The court stated: "We are persuaded that a jury instructed in the language of California's statute must necessarily understand the need for serious difficulty in controlling behavior." (*Id*. at p. 774, fn. omitted.) Thus, "a commitment rendered under the plain language of the SVPA necessarily encompasses a determination of serious difficulty in controlling one's criminal sexual violence, as required by *Kansas v. Crane*, *supra*, 534 U.S. 407. Accordingly, separate instructions or findings on that issue are not constitutionally required, and no error arose from the court's failure to give such instructions in defendant's trial." (*Williams*, *supra*, at p. 777, fns. omitted.)

*Williams* is dispositive of appellant's claim. (*People v. Paniagua* (2012) 209 Cal.App.4th 499, 526-528.) Although appellant's requested instruction correctly stated the law, the principle it conveyed was duplicative of CALCRIM No. 3454. (*Williams*, *supra*, 31 Cal.4th at p. 759.) Accordingly, it was properly refused. (*Id*. at p. 777; see *People v. Gurule, supra,* 28 Cal.4th at p. 660.)

23.

Appellant also asked the trial court to supplement CALCRIM No. 3454's definition of "likely" with a statement that the term "means much more [than a] mere possibility." The court saw no basis for making the requested modification. Again, we conclude the court did not err.

In *People v. Superior Court* (*Ghilotti*) (2002) 27 Cal.4th 888, 922 (*Ghilotti*), the California Supreme Court concluded "the phrase '*likely* to engage in acts of sexual violence' (italics added), as used in section 6601, subdivision (d) [concerning the initial screening stage of the SVPA process], connotes much more than the mere *possibility* that the person will reoffend as a result of a predisposing mental disorder that seriously impairs volitional control. On the other hand, the statute does not require a precise determination that the chance of reoffense is *better than even*. Instead, an evaluator applying this standard must conclude that the person is 'likely' to reoffend if, because of a current mental disorder which makes it difficult or impossible to restrain violent sexual behavior, the person presents a *substantial danger*, that is, a *serious and well-founded risk*, that he or she will commit such crimes if free in the community."

In *People v. Roberge*, *supra*, 29 Cal.4th at page 987, the California Supreme Court concluded "the phrase 'likely [to] engage in sexually violent behavior' in section 6600, subdivision (a), should be given the same meaning" *Ghilotti* ascribed to the phrase for purposes of section 6601, subdivision (d). Accordingly, "under section 6600, subdivision (a), which is at issue here, a person is 'likely [to] engage in sexually violent criminal behavior' if at trial the person is found to present a *substantial danger*, that is, a *serious and well-founded risk*, of committing such crimes if released from custody." (*Roberge*, *supra*, at p. 988.) The high court further held trial courts have a sua sponte duty to so define the term for jurors. (*Id.* at pp. 988-989.)

CALCRIM No. 3454 contains the requisite definition of "likely." "It is fundamental that jurors are presumed to be intelligent and capable of understanding and applying the court's instructions. [Citation.]" (*People v. Gonzales* (2011) 51 Cal.4th

24.

894, 940.)  Considered together, the words "likely," "substantial," "serious," and "well-founded" could not reasonably be understood as meaning anything but much more than a mere possibility.

The record does not indicate any confusion on the part of the jury and contains no requests for further guidance on either point.  (See *People v. Gonzales, supra,* 51 Cal.4th at p. 940; *People v. Hughes* (2002) 27 Cal.4th 287, 379.)  Moreover, the prosecutor emphasized the risk of reoffense had to be "substantial, serious, and well-founded .…"  Although he clarified it did not have to be 50 percent, the example he gave (a smoker with a "strong history" of cancer in the family, who does things that are "high risk" for cancer, may be a "serious risk" for cancer) made it clear it had to be much more than a mere possibility.  Defense counsel told jurors the legal criteria for a mental disorder required "proof of a mental illness that affects a person's ability to control his behavior in some *serious* way."  (Italics added.)  Taking the instructions as a whole, the evidence, and counsel's arguments into account, we conclude there was no reasonable likelihood the jury was misled concerning the governing law, despite the omission of the requested instructions.  (See *People v. Tate* (2010) 49 Cal.4th 635, 696; *People v. Young* (2005) 34 Cal.4th 1149, 1202; *People v. Hansen* (1997) 59 Cal.App.4th 473, 482.)  Accordingly, there was no error.

Were we to conclude the trial court should have given one or both of the requested instructions, however, we would find the error harmless for the same reasons.  The substance of the refused instructions was conveyed through the instructions that were given; no essential element of, or defense to, an SVP finding was removed from the jury's consideration, and the jury was not misled; and counsel conveyed the substance of the refused instructions in their arguments.  Under the circumstances, and in light of the evidence, it is not reasonably probable appellant would have obtained a more favorable result had either or both of the requested instructions been given.  (See *People v. Kraft* (2000) 23 Cal.4th 978, 1066; *People v. Tapia* (1994) 25 Cal.App.4th 984, 1028; *People v.*

*Mai* (1994) 22 Cal.App.4th 117, 126, disapproved on another ground in *People v. Nguyen* (2000) 24 Cal.4th 756, 758, 761.)

## **DISPOSITION**

The judgment (order of commitment) is affirmed.

_____

DETJEN, J.

WE CONCUR:

_____

HILL, P.J.

_____

GOMES, J.